Whitaker, Judge,
delivered the opinion of the court:
This case comes before the court pursuant to House Resolution 253, 81st Congress, 1st Session, referring to us H. R. 3403, for a report on whether plaintiff has a claim against *340 the United States either legal or equitable, and, if so, the amount legally or equitably due him.
Plaintiff contends (1) that an order wholly retiring him from the Army on May 5,1917, was illegal, null and void for a number of reasons; and (2) that the execution of Public Law 210,67th Congress, approved May 6,1922, quoted infra, was mandatory, and that plaintiff is accordingly entitled to all the rights and benefits he would have received had that law been executed.
Both contentions defendant disputes.
It is not seriously controverted that plaintiff was incapacitated for active duty at the time he was retired. The principal issues are (1) whether or not plaintiff was legally retired, and (2), if not, whether he should have been wholly retired, without pay, or placed on the retired list, with pay. The other issue stated above needs but little comment.
Our findings of fact, which set forth in detail the events leading up to and subsequent to plaintiff’s being wholly retired on May 5, 1917, are based upon a voluminous stipulation of facts agreed upon by the parties and a number of exhibits attached thereto. With one exception, there is no other evidence before us and there was no oral testimony. We shall state the salient facts as briefly as we can, but, unavoidably, the statement must be rather long. This, however, may obviate the necessity of reading the long findings of fact.
Plaintiff' was commissioned a first lieutenant, Medical Corps, United States Army, in May 1909. In November of that year he was assigned to duty in the Philippine Islands. About two years later, on June 2, 1911, while supervising the erection of tents during annual inspection and maneuvers at Ludlow Barracks, Parang, Mindanao, Philippine Islands, plaintiff suffered a light[1] stroke that affected his eyes.
On June 8,1911, his eyes having become very sensitive to light, he went to see Capt. J. C. Gregory, Medical Corps, who examined them with an ophthalmoscope.[2] His condition *341 was diagnosed as “Simple neuroretinitis,[3] acute, both eyes, caused by light stroke at Ludlow Barracks, P. I., June 2, 1911. Accidental. In line of duty? Yes.”’
Plaintiff was sick in quarters from June 11, 1911, to June 21,1911, when he was returned to duty. On July 1 plaintiff was again entered on the hospital record- as sick in quarters, and on July 8 he was transferred from Ludlow Barracks to the division hospital at Manila. On July IT he was admitted to the division hospital, where he was examined' and treated by Major T. C. Lyster, Medical Corps. On July 31 Major Lyster diagnosed plaintiff’s condition as acute bilateral solar retinitis,[4] “following exposure to the sun while at Ludlow Bks. Mind. P. I. on June 2,1911. In line of duty.”
On August 14,1911, plaintiff was transferred to Letterman General Hospital, San Francisco, California, for observation and treatment. On October 28, he requested three months’ sick leave, and on November 14 was released from the hospital. A notation was placed on his medical record that his condition was improved but not cured.
Plaintiff then proceeded to Washington, D. C., where he consulted Dr. Oscar Wilkinson, a civilian eye specialist. Dr. Wilkinson diagnosed plaintiff’s condition as solar retinitis (neuro) with catarrhal conjunctivae, due to exposure to tropical sun. Later, in March 1912, Dr. Wilkinson, who had been treating plaintiff’s eyes in the meantime, diagnosed their condition as subacute neuroretinitis, with catarrhal conjunctivae. He advised plaintiff not to perform duty in the tropics and expressed the opinion that plaintiff would recover in a year or two under proper treatment and surroundings.
On March 13, 1912, plaintiff returned to Letterman General Hospital. On March 14, a notation of “Retinitis cured” was placed upon his hospital medical card.
By special orders dated March 13, plaintiff was ordered to report for examination for promotion to captain. He underwent an oral examination on several subjects, but was *342 informed that due to a deficiency in his general average on the oral examinations he would be required to take written examinations on all the subjects. Plaintiff replied that he was in no condition to undergo such a severe physical strain because of his eyes, hut he did take the written examinations. At their conclusion, plaintiff’s eyes were examined by Capt. R. F. Metcalfe, Medical Corps, who found them normal with the exception of bilateral catarrhal conjunctivae, which means inflammation of the outside lining of the eyeball.
Plaintiff passed the written examinations and was promoted to captain on June 25, 1912.
On April 15, 1912, plaintiff was ordered to return to active duty at Fort Leavenworth, Kansas, where he remained until February 1913, with the exception of a short period spent at Jefferson Barracks, Missouri. During this time plaintiff’s eye condition improved very satisfactorily. As the result of an annual physical examination on November 2, 1912, it was found that plaintiff’s nervous system was normal and, with respect to his eyes, that plaintiff had a slight bilateral photophobia[5] due to slight scar tissue.
On February 28, 1913, plaintiff was ordered to duty at Texas City, Texas. Shortly thereafter he wrote the Adjutant General, 2d Division, that his eyes had become irritated from prolonged exposure to sunlight, and stated that while he was able to perform post duty in a more northern latitude, he believed that a further attempt to perform field service at his present post would shortly result in his complete incapacity for duty.
Plaintiff’s eyes were then examined by Maj. Ernest L. Ruffner, Medical Corps, and on March 25 plaintiff was informed that the results of the examination did not furnish a basis for recommending plaintiff’s return to duty at Fort Leavenworth.
Plaintiff on March 29 wrote by fourth endorsement that Major Ruffner’s report was not entirely in accordance with the facts, and that in his opinion the examination made was in some respects superficial and incomplete in scope. The same day plaintiff was admitted to the 2d Battalion Engineers’ Infirmary at Texas City, and by orders also dated *343 the same day he was ordered to the base hospital at Houston, Texas.
At plaintiff’s request he was granted 5 days’ delay en route. He proceeded to Kansas City, Kansas, where his eyes were examined on April 3 by Dr. F. J. Haas, a civilian eye specialist, whom plaintiff had consulted in 1912 while at Fort Leavenworth. Dr. Haas determined, after some difficulty of diagnosis, that plaintiff’s condition was neuro-retinitis. He advised plaintiff to refrain from being in bright light as much as possible, and was of the opinion that plaintiff could not perform duty in the tropics or subtropics.
On April 6, 1913, plaintiff reported to the base hospital, Fort Sam Houston, Texas. On May 5 he requested two months’ sick leave “in order that I may recuperate and place myself under the observation of competent eye specialists who are thoroughly conversant with my case and present indications.” This request was denied, and plaintiff shortly thereafter was ordered to the Army and Navy General Hospital, Hot Springs, Arkansas, for observation and treatment. He was admitted to this hospital on May 25,1913.
Plaintiff was examined by Capt. James D. Fife, Medical Corps, on May 26, 27, and 28. Captain Fife found that plaintiff’s retina and macula were apparently normal throughout, but that plaintiff’s general condition was neurasthenic,[6] “which is evidently the cause of his ocular discomfort.” On May 30 plaintiff requested and was subsequently granted two months’ sick leave. On June 2 the diagnosis of plaintiff’s eye condition was changed to “neurasthenia. In line of duty. Complications: neuroretinitis, chronic, bilateral, (solar), following exposure to extense [sic] light in tropics in 1910-11.” Plaintiff was discharged from the Army and Navy General Hospital on June 10,1913.
He then proceeded to Washington, D. C., and was again examined by Dr. Wilkinson, who made a diagnosis of “neuroretinitis, subacute.” On July 17 plaintiff requested by letter that at the expiration of his sick leave he be “returned to post duty, which I am capable of performing,” indicating, however, that he was unable to perform duty in southern latitudes. Plaintiff was thereupon ordered to re *344 port to Walter Reed General Hospital in Washington, D. C., with a view to determining his present fitness for post duty.
Plaintiff reported at Walter Reed Hospital on August 2. On August 10 Maj. P. S. Halloran reported that plaintiff had a mild neuroretinitis, both eyes, and recommended that plaintiff be stationed at a northern station where he would not be subjected to excessive glare or bright sunlight. On August 20 plaintiff proceeded to duty at Fort Logan, Colorado, following his discharge from Walter Reed Hospital.
Plaintiff remained at Fort Logan during the remainder of 1913 and all of 1914. His annual physical examinations for those years disclosed a normal nervous system, no incapacities for active field service, and no disabilities. By special orders dated April 3, 1915, plaintiff, who was still at Fort Logan, was ordered to Texas City, Texas, for temporary duty. On April 9 plaintiff’s eyes were examined by Dr. Melville Black, a civilian eye specialist, who gave plaintiff a certificate to the effect that the appearance of plaintiff’s optic nerves and retinae was very satisfactory at that time, but that there would be considerable risk of recurrence of plaintiff’s retinitis were he subjected to intense sunlight at that time. Dr. Black expressed the opinion that another year in the North would render plaintiff safe from recurrences, but he did not believe plaintiff was then safe from such recurrences.
On April 10 plaintiff wrote to the Adjutant General in regard to his “continued physical incapacity for duty in tropical and subtropical latitudes,” and by special orders, dated April 27, the order of April 3 assigning him to duty at Texas City was revoked. Plaintiff remained on duty at Fort Logan.
In July of 1915 plaintiff was advised by the Surgeon General’s Office of the impending issuance of an order for duty in the Hawaiian Department. Plaintiff wrote the Surgeon General that, while he was due for foreign service and ready to take his turn, he requested assignment to duty in China instead of Hawaii, as China was a more northern latitude. Plaintiff’s request was not granted because, as he was advised, assignments to China stations were made by the Commanding General, Philippine Department. Plaintiff then, *345 on August 2, 1915, requested a leave of absence of 2 months and 10 days, beginning August 15. This request was denied, and by special orders dated August 9, 1915, plaintiff was ordered to leave on October 5 for Honolulu.
On August 17 and 19 plaintiff’s eyes were examined by Dr. Edward Jackson, a civilian eye specialist of Denver, Colorado, who gave plaintiff a certificate to the effect that plaintiff would be more likely to keep in good condition for eye work if his eyes were not much subjected to bright light. Dr. Jackson was of the opinion that service in Hawaii by plaintiff would be likely to cause a relapse, with aggravation of symptoms and indefinite continuation of the condition.
By letter dated August 28, plaintiff advised the Adjutant General of his “physical incapacity for duty in tropical and subtropical latitudes,” enclosing the certificates of Drs. Black and Jackson, and one by Dr. William L. Hess, a civilian eye specialist of Denver, Colorado, to the effect that plaintiff should not serve in tropical or subtropical latitudes. Plaintiff was then ordered to Walter Reed General Hospital for observation as to his fitness for tropical service.
He was admitted to Walter Reed Hospital on September 18, 1915, and was examined by Maj. T. C. Lyster, who had examined plaintiff in the Philippines shortly after his stroke. He reported that the present condition of plaintiff’s eyes did not make him unfit for tropical service. Plaintiff was ordered to proceed to San Francisco and to take the first available transport to Plonolulu for duty in the Hawaiian Department. He was released from Walter Reed Hospital on October 8, and was placed, at his request, on 20 days’ leave of absence.
During this time he again consulted Dr. Wilkinson, who made no particular examination of his eyes at this time, but who was of the opinion that plaintiff still had solar neuro-retinitis. Dr. Wilkinson advised plaintiff it would be unwise for him to do duty at a station in the South or in the tropics. On October 27,1915, plaintiff requested 25 days’ extension to his leave, and this was granted. He proceeded from Washington to Fort Leavenworth, thence to Denver, Colorado, and thence to San Francisco by automobile, driving part of the way himself.
*346 Plaintiff sailed for Honolulu on December 6. He arrived there December 14,1915, and reported for duty at Schofield Barracks. Two or three weeks later, on January 2,1916, he was admitted to the post hospital at Schofield Barracks, and was examined by Capt. J. D. Whitham, Medical Corps. On his recommendation plaintiff was transferred to the Department hospital for further study, observation, and treatment so as to determine whether or not anything was wrong with his eyes. He was placed under the care of Maj. Matthew DeLaney, Medical Corps.
Major DeLaney examined plaintiff’s eyes, but found nothing wrong with them except a slight astigmatism in the right eye and a slight haziness in the right optic nerve head. He concluded that plaintiff was not suffering from any form of retinitis whatever. Major DeLaney also reported that plaintiff was uncooperative in his medical treatment. Because of this report, Capt. L. Mitchell, Medical Corps, was ordered to examine plaintiff as to his mental attitude in general and particularly in connection with his eye condition, and to perform a spinal puncture to determine if plaintiff suffered from syphilis of the nervous system. The result of the spinal puncture was negative. Captain Mitchell reported on February 7 that plaintiff’s symptoms strongly indicated hypochondriasis,[7] and “if not contra-indicated by an eye condition from which at present he may be afflicted, that a prolonged and rigid rest cure associated with psychotherapy would be of benefit in this case.”
On February 7,1916, Maj. G. M. Van Poole, Medical Corps, examined plaintiff’s eyes and found no abnormalities. In his opinion plaintiff was not suffering from any form of neuritis of the optic nerve. On February 10 a notation of hypochondriasis, in line of duty, was placed upon plaintiff’s medical records.
On February 18,1916, a three-man medical board was convened in the hospital to pass upon plaintiff’s case. Plaintiff was examined by the Board, which found no external evidence of abnormalities, no nystagmus,[8] and no photo-phobia. It further found that plaintiff was capable of per *347 forming the usual duties of a medical officer of the Army and recommended that he be returned to duty.
On February 23, 1916, plaintiff was discharged from the hospital and ordered to return to duty at Schofield Barracks. He was ordered to report for duty on February 24, and again on February 26, but failed to do so on both dates, because he stated he was physically incapacitated for duty by reason of his eye condition. On February 27 plaintiff was examined by Lt. Col. William P. Kendall, who found that plaintiff’s eyes were normal, that plaintiff showed no signs of hypo-chondriasis or neurasthenia, and made a diagnosis that plaintiff was “malingering.”
At about this time plaintiff consulted two civilian eye specialists in Honolulu who found that plaintiff was not suffering from any form of neuritis.
There follows a brief summary of the diagnoses of the various doctors who examined plaintiff, both Army and civilian; Army doctors in one column, and civilian doctors in another.

*348

On February 29, 1916, plaintiff was sent written orders to report for duty on the night of March 1, but he failed to do so, reporting by telephone that he was sick, and asking that he be placed on sick report. This was not done, as the executive officer thought that plaintiff was fit for duty.
On April 10, 1916, plaintiff was brought to trial before a duly constituted court-martial convened at Schofield Barracks. The first charge, of “Conduct unbecoming an officer *349 and gentleman, in violation of the 61st Article of War,” was supported by four specifications, and the second charge, of “Conduct to the prejudice of good order and discipline, in violation of the 62nd Article of War,” was supported by three specifications. On June 7, 1916, plaintiff was convicted on both charges and all specifications, except the first specification of Charge II, and was sentenced to be dismissed from the service of the United States.
The sentence of the court-martial was approved by the convening authority on June 27, 1916, and the record of the trial was forwarded to the President of the United States through the Judge Advocate General. On August 1, 1916, the Judge Advocate General reviewed the record and advised that the specifications laid under Charge I were insufficient to support the charge, and that the findings of guilty on these specifications were without legal effect. He advised with respect to specifications 2 and 3, Charge II, of which plaintiff had been found guilty, that the findings were correct and legally sufficient to sustain a sentence of dismissal, but that the sentence was more severe than the offense warranted. He recommended that the sentence be approved but that it be commuted to the loss of 25 files in lineal rank. The Secretary of War, Newton D. Baker, concurred in this, and submitted a similar recommendation to the President on August 17,1916, along with the record of the court-martial. Secretary Baker’s letter reads in part as follows:
The facts in the case, while the record is exceedingly voluminous, are very simple. This officer, himself a physician, contracted optic neuritis from exposure to sun glare in the tropics. Being a physician, and knowing too much for his own good, he immediately began to acquire and nurse subjective symptoms which had no objective reality, with the result that long after his optic neuritis was cured he still imagined himself to have it. As a consequence, he became surly, insubordinate, and rather contemptuous of his superior medical officers who disagreed with him in the diagnosis of his case.
The net result of this is that we simply had an unruly patient who disagreed with his doctors. His doctors in this case being military men and he being a part of the military establishment, he ought to have yielded at least obedience and respect to their orders. In some sense he *350 failed in this. He therefore ought to be punished, but in my judgment he ought not to be dismissed from the Army * * *.
I am so entirely familiar with states of mind like that in which Captain Waring now is, that I do not know whether I can help him or not; but if the recommendation herein set forth is approved by you, I shall write him an official letter in addition, pointing out to him that a continuance of his recent insubordinations will render his separation from the service by dishonorable discharge necessary for the discipline of the Army.
On October 10,1916,[9] the President wrote Secretary Baker, who replied on October 14, 1916, in part as follows:
The difficulty with Captain Waring is that, being a physician, he has become hypochondriac about his own condition, thinks he knows more than all the other doctors, and is not only obsessed with unwarranted notions about the condition of his eyes but is truculent and undisciplined in his attitude toward his superior officers. As soon as you have acted on the court-martial papers, I am going to send him a personal letter full of good advice, with just a little feeling that there is only one chance in a thousand of such a letter doing any good. He is an excellent man and his misfortune is greatly to be regretted. * * *
The President then issued and signed an order confirming plaintiff’s sentence, but commuting it to the loss of 25 flies in rank.
Secretary Baker wrote plaintiff on October 31, 1916, in part as follows:
* * * It is entirely clear from this record that you at one time suffered from solar retinitis. It is equally clear that you are now cured. Your experience as a physician will doubtless contain many cases of patients who had a persistent mental impression of a previous but past illness, and that is disclosed by this record to be your situation. Whether or not, however, you continue to be afflicted with any real trouble of the optic nerve or of the retina, you do continue to be, by virtue of the President’s action a member of the Army, the discipline of which requires obedience to the lawful orders of your superiors and respect for them in their professional capacity. This record shows that you have failed *351 in all respects to observe these requirements in your past relations with your senior officers of the Medical Corps. Unless you can conform to these indispensable requirements in the future, your separation from the service will of course be required for disciplinary reasons. This letter is written in the hope that your future career in the Army will be characterized by that respect for the discipline of the service upon which alone a useful career can be based.
On October 27, 1916, plaintiff was released from arrest and restored to duty.
Within a week, on November 3, 1916, plaintiff requested a three months’ leave of absence, with permission to return to the United States for treatment, stating • that he was physically unable to perform his official duties because of the condition of his eyes, and that he desired to place himself, at his own expense, under the professional observation and treatment of the best oculists in the United States. Approval of this request was recommended by the Surgeon General’s Office, Schofield Barracks, but the Commanding General, Schofield Barracks, and the Commanding General, Hawaiian Department, recommended that the request be disapproved and that plaintiff be ordered before a retiring board in the United States.
An Army Betiring Board was appointed to meet at Chicago, Illinois, for the examination of plaintiff. The Board was duly constituted and convened on January 10, 1917, at Chicago.
Immediately prior to the convening of the Board plaintiff was examined, on January 9 and 10, by Majors Peter C. Field and T. C. Lyster, Medical Corps. These were the only witnesses who testified for the Army before the Board. Upon the opening of the Board plaintiff outlined what he considered to be the facts relative to his eye condition, indicated his belief that he had a physical infirmity disqualifying him from service, and stated that, while he did not wish to appear in the light of seeking retirement, if the Board found his disability to be a fact, he did not oppose retirement.
On the afternoon of January 10, Majors Field and Lyster took the stand and submitted written reports of the physical examination of plaintiff that each had made on January 9 *352 and 10. Further testimony was then suspended to allow plaintiff’s counsel an opportunity to go over the reports with plaintiff.
On the morning of January 11 Major Lyster resumed the stand. He testified that his ocular findings indicated no organic diseases of plaintiff’s eyes, but that his findings indicated an abnormal condition; i. e., a relationship between plaintiff’s nervous system and his ability to use his eyes for the performance of duty in tropical or subtropical regions. He attributed the relationship to a number of subjective symptoms, and testified that these subjective symptoms indicated nervous asthenopia, which he went on to define, in a general way, as eye strain; i. e., asthenopie eyes are eyes which, when subjected to use, are liable, depending on the amount of use, to break down to the extent of causing pain, a sense of weariness, and general fatigue. He testified that plaintiff’s history and certain physical signs indicated that plaintiff desired to do duty only under conditions and at places agreeable to him, and that the idea that plaintiff could not perform duty in the tropics became fixed in plaintiff’s mind in 1911 when Captain Gregory told plaintiff that he had had an attack of solar retinitis. Major Lyster stated that plaintiff’s present physical disabilities were traceable to that diagnosis, and that plaintiff’s physical condition did not wholly originate in line of duty but did in part, in that the diagnosis in 1911 caused the idea to become fixed in plaintiff’s mind that he could not perform duty in the tropics. Major Lyster testified that in his opinion plaintiff’s condition was amenable to treatment, although he did not know how long it would take, and, not being a neurologist, he did not feel competent to . say whether or not the underlying nervous causes could be' cured. He was further of the opinion that' plaintiff Ayas physically qualified to perform duty, provided he was willing to do so under all conditions of active service, and provided that plaintiff possessed sufficient willpower to maintain self-control, but that, if plaintiff was unwilling to perform duty in an assigned post, his physical disability did disqualify him for duty.
Major Field then- took the stand and testified that his ocular findings did not indicate any organic disease of the *353 eyes. He diagnosed plaintiff’s condition as asthenopia, which he defined as eyestrain, and stated that in his opinion the asthenopia was dependent upon instability of plaintiff’s nervous system. Major Field further testified that, while he was not claiming to be an expert or to have special knowledge of nervous diseases, in his opinion plaintiff’s unstable nervous system was congenital and, therefore, existed prior to commission. He was also of the opinion that plaintiff’s symptoms of asthenopia were amenable to treatment, and that plaintiff was physically able to perform all the duties of his rank provided he was willing to do so under all conditions, and provided he possessed sufficient willpower to maintain self-control.
On the afternoon of January 12 the Board met and adjourned without objection, as the record had not yet been brought up to date. It reconvened on January 13, and further testimony was given by Major Field. Following the completion of this testimony the Board adjourned until January 16, when it reconvened. Counsel for plaintiff then advised the Board that under his instructions plaintiff had submitted to the examination of a civilian eye specialist in Chicago, but that the specialist had not yet completed his examination. Plaintiff’s counsel also stated that plaintiff was desirous of submitting himself to the examination of specialists in the East, both eye and neurological, in view of the suggestion of nervous instability existing since childhood. Plaintiff’s counsel claimed that he had been surprised by this evidence, and requested adjournment until January 25, to enable plaintiff to consult with specialists and adduce their depositions before the Board. The Board refused this request and, after plaintiff testified on his own behalf, the Board closed for deliberations. The Board found as follows:
Captain John B. H. Waring is incapacitated for active service by reason of a neurosis affecting the functions of the eyes to such an extent as to disable him for the performance of military duty.
The board further finds that the exciting cause of the incapacity was an illness at Parang, P. I., June 2,1911; that the underlying or fundamental cause is a detective nervous system; that said incapacity is not incident to the service; and that it is not permanent.
*354 Upon the recommendation of the Surgeon General, plaintiff was ordered to Letterman General Hospital for observation and treatment for a period of six weeks. Plaintiff was examined by Lt. Henry L. Wagner and Maj. L. L. Smith, Medical Corps officers, who diagnosed plaintiff’s condition as hystero-neurasthenic asthenopia.[10] Major Smith submitted a detailed report on April 10,1917, in which he stated in part that there was no definite evidence in plaintiff’s past history to indicate nervous instability in childhood or before he was commissioned, except the symptoms referable to his eyes; that a prognosis as to complete recovery from the basic disease was unfavorable, and that plaintiff was permanently incapacitated from performing the duties of his grade. He concluded that plaintiff was suffering from asthenopia, hystero-neurasthenic form, due to an inherent unstable nervous organization which existed prior to commission and which was, therefore, not in line of duty. The disability was believed to be permanent, and plaintiff’s retirement was therefore recommended.
On April 21,1917, Col. G. B. Duncan, General Staff, submitted a memorandum to the Chief of Staff stating that the Surgeon General concurred in the conclusion of Major Smith, and recommended that the findings of the Board[11] be approved and that Captain Waring be wholly retired.
On May 2,1917, the Chief of Staff submitted a memorandum to the Secretary of War stating that Major Smith confirmed the opinion of the Board that the disability was due to a cause which existed prior to commission and that Major Smith found that the disability was permanent. The Chief of Staff recommended that the findings of the Retiring Board be approved and that plaintiff be wholly retired.
Three days later, on May 5,1917, Secretary of War Newton D. Baker issued the following order:
The proceedings and findings of the retiring board are approved by the President, and by his direction, Cap *355 tain John B. H. Wabing, Medical Corps, is wholly retired from the service under the provisions of Sections 1252 and 1275, Bevised Statutes, and his name will, hereafter, be omitted from the Army Register.
Also, on May 5, 1917, special orders were published as follows:
Capt. John B. H. Wabing, Medical Corps, having been found by an Army retiring board incapacitated for active service on account of disability which is not the result of any incident of the service, and such finding having been approved by the President, is, by his direction, wholly retired from the service under the provisions of sections 1252 and 1275, Revised Statutes, and his name will hereafter be omitted from the Army Register.
The same day plaintiff was notified by telegram that he was wholly retired from the military service. He thereafter received one year’s severance pay, as provided by law.
On May 22,1917, plaintiff addressed a letter to the President requesting a rehearing before an Army retiring board. The record does not show that any action was taken on this application.
No specific record was located in the files of the War Department stating who was appointed to the office vacated by plaintiff’s retirement, although the vacated office apparently was filled by one Charles L. Gandy.
The foregoing is the medical history relevant to the pro-, priety of plaintiff’s retirement, and the proceedings of the court-martial and Retiring Board.
We think it is also relevant to briefly recite the facts as to plaintiff’s mental attitude.
Rightly or wrongly, plaintiff distrusted the Army medical authorities, and made but little effort to conceal that distrust.
When, on March 25,1913, plaintiff was informed of Major Ruffner’s statement that his examination of plaintiff’s eyes disclosed nothing that would prevent his serving at Texas City, plaintiff wrote that the examination had been superficial and incomplete and was not in accord with the facts.
While in the base hospital in Houston, Texas, he requested two months’ leave so that he could place himself “under the *356 observation of competent eye specialists who are thoroughly conversant with my case and present indications.”
He protested against being sent to Hawaii. Almost immediately after arrival he was sent to the hospital to have his eyes examined. He refused to permit the doctor to examine his eyes with an ophthalmoscope, and protested in writing:
The medical history of the case is absolutely clear, and the diagnosis has been confirmed without the slightest hesitancy by a considerable number of the most competent eye specialists in the United States. * * * If the diagnosis cannot be confirmed by Army medical officers after the numerous examinations made by them, it can only be regarded as an indication of professional incompetence and inexperience on their part, in the special diagnosis and treatment of diseases of the eye.
After having been found fit for duty by the Army doctors, plaintiff consulted two civilian doctors, who found no neuritis.
He was ordered to duty on February 24,1916. He refused to report. He was again ordered to duty on February 26. He again refused to report. Once again he was ordered to' duty on March 1, but he reported he was sick and unable to do duty.
When he was court-martialed, he was placed under arrest. Within a week after he was released from arrest and restored to duty, he requested a three-month leave of absence and permission to return to the United States. The reason assigned was: “I am physically unable to perform my official duties in the present condition of my eyes, and I desire to place myself, at my own expense, under the professional care and treatment of the best oculists in the United States.”
In the six years between his injury and the Retirement Board proceedings, plaintiff consulted seven different civilian oculists, some of them more than once.
Since his retirement, he has written many letters to high Government officials. He has maintained that he was a “victim of one of the most remarkable, the most unbelievable, and the most infamous conspiracies in [the] entire history of the United States Army.”
*357 In summary, plaintiff suffered an eye injury in line of duty on June 2,1911. He thereafter consulted seven or more different civilian specialists, some of them more than once, and was examined by at least ten Army doctors, and some of these more than once. He was twice hospitalized at Walter Beed Hospital, twice at Letterman General Hospital, and once each at the base hospital, Fort Sam Houston, Texas, the Army and Navy General Hospital at Hot Springs, Arkansas, and at the hospital in Hawaii. The diagnoses of these doctors are in part conflicting. The preponderance of the evidence, however, is that by late 1915 or early 1916 plaintiff’s original eye injury was cured; but plaintiff continued to believe that he still had an eye injury which incapacitated him for the performance of duty in tropical or subtropical latitudes.
Plaintiff sincerely believes that he has been wronged and has been most persistent, pertinaceous even, in his efforts to secure redress. But, as we shall later see, he insisted on choosing his own forum; he would have nothing to do with Army boards or officials.
In 1918, and again in 1919, bills for the relief of plaintiff were introduced in the Senate. In 1922, Congress passed, and the President approved on May 6,1922, Public Law 210, 67th Congress, which reads as follows:
Be it enacted, by the Senate and Home of Representatives of the United States of America in Congress assembled, That the President of the United States be, and he is hereby3 authorized to restore to John B. H. Waring, late a captain in the Medical Corps, the files of which he was deprived, and, by and with the advice and consent of the Senate, appoint him an officer of the Medical Corps in the Army of the United States as of May 5, 1917, with such rank as he would have attained had he not been discharged, and when so appointed he shall be placed on the retired list of the Army.
On February 2,1923, the following letter was sent to President Harding by members of the subcommittee considering bills for the relief of plaintiff:
We of the subcommittees of Congress to which were referred the bills for the relief of Captain J. B. H. Waring — some of us were at first opposed to the action— submit that our investigation through three committees *358 of each House, established beyond a doubt the injustice done the officer. His dismissal being without authority of law was null and void and no legislation should have been necessary.
A former administration of the War Department reported against the bill and went so far as to refuse the request of the committee for the papers in the case. Notwithstanding this opposition the bill passed the Senate twice and would as often have passed the House but for lack of time.
We are convinced that the War Department should not be allowed to arbitrate in the matter and if our investigation is not sufficient to induce your action then we respectfully submit that some disinterested law officer of the Government be directed to study the case and make report to you, thus enabling you to carry out the law and undo the injustice to which every day’s delay only adds.
President Harding and all subsequent Presidents, however, have refused to take the action authorized by this law.
In May 1924 the Secretary of War directed that the Inspector General investigate plaintiff’s case, but plaintiff advised the Inspector General that he could take no part in such an investigation. On July 15, 1924, and again on September 80, 1924, plaintiff wrote letters to the Secretary of War in which he accused an unidentified officer of the Army General Staff of having offered to influence the investigation of plaintiff’s case for a “sufficient monetary consideration” paid in advance. Plaintiff was requested to substantiate these charges, but did not do so.
In 1931 Gen. Douglas MacArthur, then Chief of Staff, ordered the Inspector General to investigate plaintiff’s case, and a report was made by the Inspector General that there were no legal or equitable grounds to warrant further consideration of it, that plaintiff was wholly retired legally, and that Public Law 210 was not mandatory. In 1933,1935, and 1936, bills for the relief of plaintiff were introduced in the House. The bill introduced in 1936 was passed by Congress, but President Franklin D. Boosevelt vetoed it. Another bill, introduced in 1939, was referred to the House Committee on Military Affairs, but no further action was taken.
On October 9, 1944, plaintiff was advised that under the provisions of section 302 of the Servicemen’s Beadjustment *359 Act of 1944 he was entitled to a review of his case. On November 1,1944, plaintiff submitted an application for review to the War Department. He was notified by letter dated November 11 that his case would be reviewed on December 12.1944, by the Disability Review Board. Plaintiff advised the Secretary of the Board that he would be unable to appear in person and that it would be impracticable for him to be represented by an attorney.
The Board reviewed plaintiff’s case on December 12,1944. On January 11,1945, it affirmed all the findings of the Retiring Board, and plaintiff was notified to this effect on January 15.1945.
Plaintiff’s first contention is that the order of May 5,1917, wholly retiring him from the Army was illegal, null, and void, because (1) the finding of the Army Retiring Board that his incapacity was not incident to his service was erroneous; (2) that the Retiring Board arbitrarily deprived him of the right to adduce evidence in his own behalf; (3) that a “wholly retirement” order cannot be based on the finding by the Retiring Board of a nonpermanent incapacity; and (4) that the findings of the Retiring Board were never approved, and plaintiff’s retirement was never ordered by the President.
Defendant replies that the order retiring plaintiff was legal; that the findings of fact of the Army Retiring Board, not being arbitrary or capricious, are final and conclusive; that plaintiff received a full and fair hearing before the Retiring Board; that it was proper and legal for the Secretary of War to take final action in approving the findings and proceedings of the Retiring Board, and in ordering that plaintiff be wholly retired, in the name of the President; and that at the time plaintiff was wholly retired a finding of permanent disability was not essential in order to wholly retire an officer.
Plaintiff’s second contention is that the execution of Public Law 210 was mandatory, while defendant says that Public Law 210 is permissive only. For reasons of convenience, we discuss this issue first.
*360 Public Law 210, 67th Congress, approved May 6, 1922, provides:
* * * That the President of the United States be, and he is hereby, authorized to restore to John B. H. Waring, late a captain in the Medical Corps, the files of which he was deprived, and, by and with the advice and consent of the Senate, appoint him an officer of the Medical Corps in the Army of the United States as of May 5, 1917, with such rank as he would have attained had he not been discharged, and when so appointed he shall be placed on the retired list of the Army.
Although President Harding approved the act, he and all subsequent Presidents have refused to take the action authorized. Plaintiff’s position, in essence, is that the word “authorized” should be construed as “directed”, relying upon the rule that in order to give effect to the legislative intent words permissive in form are often construed as imperative;
However, we cannot impute an intention to Congress to require the President to appoint plaintiff an officer in the Army, for to do so would raise grave doubt of the constitutionality of the act. An officer of the Army, on being wholly retired, becomes a civilian, and he can be readmitted to the service only by a new appointment (Miller v. United States, 19 C. Cls. 338, 353; Denby v. Berry, 263 U. S. 29, 35-36). The power to nominate an officer of the Army is in the President alone, as the Chief Executive and the Commander in Chief of the Army and Navy. The sole function of Congress is to advise and to consent to or dissent from a nomination made by the President.
We take it this needs no elaboration.
We come back, then, to plaintiff’s contention that the findings of the Retiring Board were never approved by the President, and that plaintiff’s retirement was never ordered by him, as required by statute. The pertinent statutory provisions are:
R. S. 1250, 10 U. S. C. (1946 Ed.) § 965.
The proceedings and decision of the [retiring] board shall be transmitted to the Secretary of War, and shall be laid by him before the President for his approval or disapproval and orders in the case.
*361 R. S. § 1252,10 U. S. C, (1946 Ed.) § 934.
When the board finds that an officer is incapacitated for active service, and that his incapacity is not the result of any incident of the service, and its decision is approved by the President, the officer shall be retired from active service, or wholly retired from the service, as the President may determine. The names of officers wholly retired shall be omitted from the Army Register.
The Retiring Board made its findings on January 16,1917. Plaintiff was thereafter transferred to Letterman General Hospital for observation and treatment, and in a report dated April 10, 1917, plaintiff’s eye condition was .diagnosed as hystero-neurasthenic asthenopia, due to an unstable nervous system which existed prior to his commission as an officer, and not, therefore, in line of duty. The report stated that the disability was believed to be permanent, and plaintiff’s retirement was therefore recommended.
Colonel G. B. Duncan, General Staff, War Department, submitted a memorandum to the Chief of Staff on April 21, 1917, in which was quoted portions of the April 10 report, and recommended that the findings of the Retiring Board be approved and that plaintiff be wholly retired. The Chief of Staff, on May 2, 1917, submitted a memorandum to the Secretary of War concurring in this recommendation. Three days later Secretary of War Newton D. Baker issued the-order wholly retiring plaintiff.
There is no evidence that President Wilson ever personally approved the findings of the Retiring Board, that he personally ordered plaintiff to' be wholly retired, or that he delegated specific authority to the Secretary of War to approve plaintiff’s retirement. On the contrary, it is clearly indicated that the order of retirement was never submitted to him and that he did not give it his personal attention. He did give his personal attention to the sentence of the court-martial dismissing plaintiff from the service, and commuted it, but the indications are that he never gave the order of retirement his personal attention.
The first indication, slight though it is, is that only three days elapsed between the recommendation of the Chief'of Staff and the order of the Secretary of War retiring him. Within this three days, did the Secretary of War consider *362 the matter, make his recommendation and receive authority from the President to issue the order ? It is possible, but not probable.
Besides, there is no record of a written , recommendation from the Secretary to the President; nor is there an endorsement on the recommendation of the Chief of Staff showing that it was forwarded to the President. There is no written communication from the President.
In a letter dated April 18, 1936, nineteen years later, to Senator Sheppard, then Chairman of the Senate Committee on Military Affairs, Secretary of War Dern advised in part: “After a further review of the entire case in the War Department, the proceedings and findings of the Betiring Board were approved by the Secretary of War (Mr. Baker) who took final action in the name of the President, and on May 5, 1917, the War Department issued the following order: * * * the War Department holds that the approval and issuance of the wholly retirement order by the Secretary of War, for the President, was valid exercise of duly delegated authority of the Executive; * *
Defendant has also attached as an appendix to its brief a certificate by the Adjutant General of the Army, dated April 8, 1953,[12] which states that sometime subsequent to 1890 a form of approval was adopted for the signature of the Secretary of War, “which read substantially as follows: ‘The proceedings and findings of the Retiring Board are approved by the President; and, by his direction * * * is retired from active service this date in conformity with Section 1251, Revised Statutes, * * * Secretary of War.’ ” The certificate further states that at the time of plaintiff’s retirement in 1917 “it was the established policy and consistent practice in effect since 1861 for the Secretary to act on the proceedings of Army retiring boards under the provisions of Section 1252, Revised Statutes, rather than transmit them to the President for approval or disapproval action and signature.” [Italics ours.]
These facts indicate quite clearly, we think, that Secretary Baker took final action in plaintiff’s case, and that the *363 President never gave it his personal attention. Defendant practically concedes this. Defendant argues, however, (1) that the long-established administrative interpretation of the statute is entitled to great weight and is not to be overturned unless clearly wrong, (2) that the proceedings of a retiring board are administrative, and that the review of the findings of a retiring board, accordingly, does not require personal action by the President, and, therefore, the Secretary of War could legally take final action in the name of the President.
We have reached the conclusion that defendant’s position is untenable, and that the long-established administrative interpretation of the statute is wrong. The statute is explicit ; it leaves no room for doubt. It says: “The proceedings and decision of the [retiring] board shall be transmitted to the Secretary of War and shall he laid hy him, before the President for his approval or disapproval and orders in the case.” [Italics ours.] There can be no doubt that the Secretary was obligated to lay the matter before the President ; he could not act for him.
In discussing the statutes controlling the retirement of Navy officers, similar in all respects to those here pertinent, the Supreme Court has said that “The law requires a record of the proceedings and decision of the retiring board to be made and transmitted to the Secretary of Navy and by him laid before the President for his approval or disapproval and orders in the case” (United States v. Burchard, 125 U. S. 176, 179). The Attorney General in 1896 said, after quoting the Revised Statutes dealing with Army retiring boards: “* * * [N]o officer can be retired from the Army upon the report of any board, even if such report be approved by the Secretary of War, except Ht is approved hy the President''.” (21 Op. Atty. Gen. 385, 389). [Italics in original.]
The statutes contemplate that the President is to consider personally the proceedings and decisions of the retiring board, which “shall” be laid before him by the Secretary of War, and personally to approve or disapprove them and to issue orders in the case. “Such a power he cannot delegate. * * * He may call others to his assistance in making his examinations and in informing himself as to what ought to be done, but his judgment, when pronounced, must be his *364 own judgment, and not that of another.” (Runkle v. United States, 122 U. S. 543, 557; Cf. United States v. Page, 137 U. S. 673; United States v. Fletcher, 148 U. S. 84; French v. Weeks, 259 U. S. 326, 334). The Bunkle case concerned a sentence of a court-martial, but the statutory requirement in such a case is couched in much the same language as the requirement for orders of retirement. As in an order of retirement, so in certain sentences of a court-martial, it is required that the proceedings shall be transmitted to the Secretary of War and laid by him before the President.
The contention there, as here, was that the President might delegate this power, but the Court said at page 557:
There can be no doubt that the President, in the exercise of his executive power under the Constitution, may act through the head of the appropriate executive department. The heads of departments are his authorized assistants in the performance of his executive duties, and their official acts, promulgated in the regular course of business, are pi’esumptively Iris acts. That has been many times decided by this court (Wilcox v. Jackson, 13 Pet. 498, 513; United States v. Eliason, 16 Pet. 291, 302; Confiscation Cases, 20 Wall. 92, 109; United States v. Farden, 99 U. S. 10, 19; Wolsey v. Chapman, 101 U. S. 755, 769).
Here, however, the action required of the President is judicial in its character, not administrative. As Commander in Chief of the Army he has been made by law the person whose duty it is to review the proceedings of courts-martial in cases of this kind. This implies that he is himself to consider the proceedings laid before him and decide personally whether they ought to' be carried into effect. Such a power he cannot delegate. His personal judgment is required, as much so as it would have been in passing on the case, if he had been one of the members of the court-martial itself. He may call others to his assistance in making his examinations and in informing himself as to what ought to be done, but his judgment, when pronounced, must be his own judgment and not that of another. And this because he is the person, and the only person, to whom has been committed the important judicial power of finally determining upon an examination of the whole proceedings _ of a court-martial, whether an officer holding a commission in the army of the United States shall be dismissed from service as a punishment for an offense with which he has been charged, and for which he has been tried. * * *
*365 This was reaffirmed in United States v. Page, United States v. Fletcher, and French v. Weeks, supra.
We conclude, therefore, that under the facts of the case the order wholly retiring plaintiff from the Army was illegal, null, and void; that plaintiff has never been legally retired from the Army, and that accordingly he would have a legal claim against the United States but for the bar of the statute of limitations.
We recognize that a rule requiring the President to act in person in these cases puts on him a burden he would find it difficult to carry along with the many other heavy burdens he cannot escape; but we can only construe and apply the law as it is, and not as we might think it should be. Only Congress can change it.
However, although plaintiff was illegally retired, it does not necessarily follow that Congress should now make an award to him. If Congress should be of the opinion that on the merits he should have been wholly retired, it no doubt would not want to compensate him now, although the legal prerequisites to his retirement were not complied with.
Before going into the merits, however, we should dispose of defendant’s contention that the findings of the Retiring Board are final.
Had the findings of this Board been approved by the President, they would have been conclusive on any court; but they were not so approved, and, hence, are not binding. There is no doubt that the findings of an administrative board may be made final and not subject to review by any court; but, where a review of the findings is provided for, the findings are not final until they have been reviewed and approved. In all the cases cited by defendant, where a review was provided for, there had been such a review or the question of a lack of review was not raised.
Furthermore, they would not be binding on Congress in any event; they are binding on the courts, but not on Congress. Congress, by its former enactment making the findings final and conclusive, did not surrender the power to amend or repeal its former enactment. The body that made the law may set the law aside where in its discretion justice requires it.
*366 We now go to the merits.
That plaintiff was incapacitated for active service admits of little doubt. He practically concedes this. In his statement before the Retiring Board he said he did not want to be in the position of seeking retirement, but was willing to be put on the retired list, if it was found that his eyes were permanently injured.
The determination of whether or not the incapacity was incident to his service presents a more difficult issue.
In the first place, what incapacitated him ? According to the weight of the evidence, plaintiff’s original eye injury, which had been sustained in line of duty, had been cured. But plaintiff was obsessed with the notion that it had not been cured, or, if cured, that it would recur if his eyes were again exposed to strong sunlight. It was this obsession, this overriding fear, that incapacitated him. This, in substance, is what the Retiring Board found. It is supported by the testimony of Captain Fife, who examined plaintiff in 1913, by Captain Mitchell, who examined him in 1916, and by Major Lyster, Major Field, and Major Smith, who examined him in 1917. It is further supported in part by the doctors who found nothing wrong with his eyes, beginning in 1915 down to the proceedings of the Retiring Board in 1917. These doctors were: Major Lyster (1915), Major DeLaney (1916), Major Van Poole (1916), the medical board (1916), Lieutenant Colonel Kendall (1916), and by Dr. Morgan, a civilian (1917). Civilian doctors Black, Jackson, and Hess also found plaintiff’s eyes all right in 1915, but thought it risky for them to be exposed to bright sunlight. There were a total of 15 doctors, Army and civilian, who from 1915 to 1917 pronounced plaintiff’s eyes cured. But plaintiff did not believe it.
We cannot escape the conclusion that the trouble was in his mind.
It seems to us, therefore, that the Retiring Board was correct in saying that the reason for plaintiff’s incapacity was a neurosis affecting the function of his eyes. So, we repeat, it was plaintiff’s overriding fear that the injury would recur that incapacitated him.
*367 The fear was not without some basis. A year and a half or two years earlier three different civilian eye specialists had advised against exposure to bright sunlight. It is true some fourteen Army doctors and one civilian had since pronounced his eyes cured, and all who expressed themselves on the subject said that he was able to serve in tropical zones, and no one in the last year or two had advised against exposure to bright light. But the fear persisted, and plaintiff either did not try to conquer it or was unable to do so. He thought himself disabled, whether he was or not.
On the evidence, we must conclude that plaintiff’s fear of a recurrence of his trouble was not well founded, and that his refusal to report for duty, as ordered, unjustified as it would have been in any event, did not even have the extenuation of a well-founded apprehension of injury to his eyes. Plaintiff was morbidly anxious about his eyes; his belief that they were still affected by the old injury or that they might be similarly injured again was largely a figment of his imagination.
The evidence points to nothing in his Army career that could have caused such a state of mind. Many, many people sustain injuries which incapacitate them for the time being, but from which they recover and live normal lives thereafter. If they go through the rest of their lives thinking themselves disabled, it is not the injury that causes their incapacity, but their emotional or mental or nervous makeup.
Since it was this state of mind that incapacitated plaintiff, and not the eye injury, we are obliged to conclude that his incapacity was not incurred in line of duty.
Plaintiff also contends that he was deprived of a full and fair hearing by the refusal of the Retiring Board to grant a continuance of the hearing for ten days in order to permit him to secure expert witnesses as to his mental and physical condition.
We are of the opinion that the question of granting or denying the request for a continuance was within the discretion of the Retiring Board, and we cannot say, upon the facts before us, that the denial of the request constituted a gross abuse of discretion. The testimony of Majors Field and Lyster relative to the instability of plaintiff’s nervous *368 system was introduced during the first two days of the hearing. The hearing lasted six days, and it was not until the sixth day that the request for continuance was made. Moreover, as far back as 1913 his trouble had been diagnosed as neurasthenia, which means emotional instability, and several subsequent diagnoses had been to the same effect, although different words were used. The testimony before the Ketiring Board could not have come as a surprise to plaintiff.
We. see no legal deprivation of the statutory right to a full and fair hearing.
It may be noted, however, that the Acting Judge Advocate General, S. T. Ansell, advised the Secretary of War in a memorandum dated August 7, 1918, that “a somewhat too unyielding exercise of its discretionary power by the retiring board resulted in Dr. Waring being deprived of the right to adduce evidence in his own behalf which might possibly have resulted in a different finding by the board, or which might have induced the President to withhold his approval of the board’s finding.” But Secretary Baker disagreed with the Judge Advocate General.
However that may be, plaintiff has produced no evidence before us which could have affected the findings of that Board, nor any that convinces us that its findings were not substantially correct. The refusal to grant a continuance did not, therefore, prejudice plaintiff.
Finally, plaintiff argues that an order wholly retiring him. could not be based on a finding by the Ketiring Board of a nonpermanent incapacity resulting from a nonpermanent disability. There are no Army regulations on this point prior to September 7, 1921, four years later. However, in Digest of Opinions of the Judge Advocate General of the Army, 1912, several years before plaintiff’s retirement, page 986, paragraph IB2b (1), there appears the following:
Incapacity for service by reason of physical disability relates, of course, to a permanent incurable disease, or injury of such a character as to absolutely disqualify the officer affected by it for duty on the active list. Deafness, defective vision, and incurable organic diseases are examples of such a disability. If, however, the disease be curable or of such a character as to yield to treat *369 ment then, even though a cure may require considerable time, the disability is not permanent and the officer may be passed. And that question is for the board to determine. The test should be, Is the disease or injury curable or incurable. If it be curable within a reasonable time, then the officer should be passed; if it be incurable within such reasonable time, the finding should be adverse (C. 11350, October 7, 1901).
The Board found that plaintiff’s disability was not permanent but the report of the Letterman General Hospital, where plaintiff was sent for observation after the findings of the Retiring Board, stated that he was permanently disabled. Their report of April 10, 1917, approximately three months subsequent to the Retiring Board findings, read in part as follows:
10. Prognosis. — Unfavorable as to complete recovery from the basic disease. The eye symptoms might improve at some future time, later giving place to other nervous symptoms of more or less disabling character. It is believed that he is permanently incapacitated from performing the duties of his grade. * * *
11. This officer is suffering from asthenopia, hystero-neurasthenic form, due to an inherent unstable nervous organization which existed prior to commission and is, therefore, not in line of duty. This disability is believed to be permanent, and his retirement is therefore recommended.
Actually it would seem that plaintiff was permanently disabled at the time he was wholly retired. In the six years that had elapsed since plaintiff’s eyes had been injured, plaintiff had put in hardly more than two years of duty; most of his time had been spent in hospitals or on leave. When plaintiff was sent to Texas, and later to Hawaii, he immediately complained of his eyes, before his old injury could have possibly recurred, and pronounced himself unfit for duty. Apparently this would have gone on indefinitely. We think the Secretary of War was justified in concluding that plaintiff was permanently disabled, or, at least, that there was no prospect in the foreseeable future that plaintiff would recover from the hallucination that he could not do duty in strong sunlight. He was, therefore, justified in wholly retiring him.
*370 Defendant makes a number of minor arguments not specifically discussed herein, but which we have considered and have determined to be without merit.
Plaintiff was not a malingerer, but he was a hypochondriac; he was one of those unfortunate personalities who has imaginary ailments. He was contemptuous of the Army Medical Corps; he did not forbear to belabor them when they ruled against him. He was recalcitrant; he was insubordinate, an unforgivable sin in the Army, as it must be. He declined to do duty as commanded.
Plaintiff honestly believes he has been grievously wronged. However, while the Army is not noted for its compassion in dealing with recalcitrants, the record shows this man was treated with great consideration. In the six years he was in the service after his injury, he was either on leave or in the hospital more than half of the time. He himself admits he was incapacitated, and, since we do not think this incapacity was incident to his military service, we believe the order wholly retiring him was justified. It follows that plaintiff has no claim against the United States, either legal or equitable.
The payment of a gratuity is, of course, within the discretion of Congress.
Madden, Judge; Litiueton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the stipulation of the parties, and the briefs and argument of counsel, as follows:
1. This claim is before the Court of Claims pursuant to House Resolution 253,81st Congress, 1st Session, which reads in pertinent part as follows:
Resolved, That the bill (H. R. 3403) entitled “A bill for the relief of John B. H. Waring,” now pending in the House of Representatives, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to Sections 1492 and 2509 of Title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said section and report to the House, at the earliest practicable date, giving such findings of fact and *371 conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
2. H. It. 3403, 81st Congress, 1st Session, which was introduced on March 9,1949, provides in part as follows:
That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Dr. John B. H. Waring, of Wilmington, Ohio, the sum to which he would have been entitled had Public Law Numbered 210, Sixty-Seventh Congress, approved May 6,1922, been enforced and carried out: Provided further, That files of which he was deprived as of May 5,1917, be restored to him as set forth in said public law.
3. Public Law 210, 67th Congress, approved May 6,1922, provides in pertinent part as follows:
That the President of the United States be, and he is hereby, authorized to restore to John B. H. Waring, late a captain in the Medical Corps, the files of which he was deprived, and, by and with the advice and consent of the Senate, appoint him an officer of the Medical Corps in the Army of the United States as of May 5,1917, with such rank as he would have attained had he not been discharged, and when so appointed he shall be placed on the retired list of the Army.
4. Plaintiff, John B. H. Waring, was born on October 12, 1884, in Danville, Virginia. His ancestors were healthy, long-lived men and women. There is no medical history on either side of plaintiff’s family of any nervous disease, insanity, tuberculosis, syphilis, or chronic alcoholism.
5. In 1905, while performing work of a statistical nature in the Department of Agriculture, plaintiff had some temporary trouble with his eyes. He consulted Dr. D. K. Shute, a Washington oculist, for treatment, and was advised that the only thing wrong with plaintiff’s eyes was that they were tired. Plaintiff was fitted with glasses. At this time plaintiff was studying medicine at night at George Washington University, and in June of 1907 he graduated from George Washington University Medical School with an M. D. degree. His class standing was second in a class of 62 graduates.
*372 6. Following bis graduation in 1907, plaintiff served one year as resident physician at Emergency Hospital, Washington, D. C. Shortly prior to August 1908 his eyes were again examined by Hr. Shute, who found that plaintiff’s eyes were normal except for a slight amount of astigmatism.
7. In August 1908 plaintiff passed the physical examination for appointment in the United States Army, and on September 14, 1908, he was offered a commission as first lieutenant, Medical Reserve Corps. He accepted this commission on September 22, 1908, and from October 1, 1908, to June 1,1909, was on duty as a student officer at the Army Medical School, Washington, H. C. During this period plaintiff occasionally suffered from eye fatigue following long periods of study. He consulted a civilian oculist, who refracted his eyes and prescribed glasses for close work.
8. In May 1909 plaintiff passed the physical examination for a commission in the Regular Army. On May 24, 1909, he was commissioned a first lieutenant, Medical Corps, United States Army, and he accepted this commission on July 5, 1909. On June 18, 1909, he reported for duty as Medical Officer at Fort Miley, California, and in September 1909 he began to wear glasses at all times.
9. On November 5, 1909, plaintiff left Fort Miley on the U. S. Transport Sheridan for duty in the Philippine Islands. Before leaving California he bought a pair of amber-colored glasses for use in the islands. He landed at Manila in December and was assigned to duty at Camp Kiethly, Mindanao.
10. On December 21, 1910, while stationed at Camp Kiethly, plaintiff was given an annual physical examination. His physical condition at that time is recorded in part as follows:
Vision:
Right eye_20/20
Left eye-20/20
Right eye corrected by +.50 D cyl AX 93° to_20/20
Left eye corrected by +.25 D cyl AX 90° to_20/20
Nervous system-Normal
Nature and degree of disability-None
11.On March ¡6, 1911, plaintiff was relieved from duty at Camp Kiethly and transferred to Ludlow Barracks, Parang, *373 Mindanao. During the period of time that he had been in the Philippines, plaintiff wore amber-colored glasses when exposed to the sunlight, as he found that it caused discomfort to his eyes.
12. On June 2,1911, while supervising the erection of tents during the annual inspection and maneuvers at Ludlow Barracks, plaintiff suffered a light stroke that produced dizziness, blurred vision, intense headaches, and loss of appetite. The next day, June 3, plaintiff mentioned these conditions to Capt. J. C. Gregory, Medical Corps, and Lt. Clarence E. Fronk, Medical Corps, stating that he thought he had been “scorched” by the sun. No examination of plaintiff’s eyes was made at this time. For the next few days plaintiff suffered fleeting vertigo and at times could not see clearly out of the corners of his eyes. On June 8 his eyes became very sensitive to light, and he went to see Captain Gregory, who examined his eyes that night with an ophthalmoscope.[13]
13. From June 11,1911, to June 21,1911, plaintiff was sick in quarters at Ludlow Barracks. The diagnosis on his hospital record card at the Ludlow Barracks Military Hospital was made by Captain Gregory and states as follows: “Simple Neuroretinitis,[14] acute, both eyes; caused by light stroke at Ludlow Barracks, P. I., June 2, 1911. Accidental. In line of duty? Yes.” On June 21 plaintiff was returned to duty.
14. On June 22, 1911, Captain Gregory again examined plaintiff’s eyes with the ophthalmoscope after the pupils had been dilated with cocaine. Plaintiff’s eyelids were somewhat irritated at this time, and Captain Gregory applied silver nitrate to the eyelids. Apparently the silver nitrate was too strong and plaintiff’s eyelids were burned by this application. After the effects of the cocaine had worn off, plaintiff felt pain in his eyelids. The next morning his eyes *374 were filled with pus discharges. He felt intense pain in both eyes for three days. Although his vision remained good during this period, exposure to bright light and efforts on his part to do close work caused discomfort.
15. On July 1, 1911, plaintiff was again entered on the hospital records as “sick in quarters.” His hospital record card bore the same diagnosis as that given in finding 13. On July 8 he was transferred to the division hospital at Manila for observation and treatment, and his medical transfer cards (signed by Captain Gregory) bore the same diagnosis. Oh July 17 plaintiff was admitted to the division hospital, where he was examined and treated by Maj. T. C. Lyster, Medical Corps. On July 18 Major Lyster recorded plaintiff’s condition as “Photophobia,[15] marked. Iris apparently normal. Conjunctivae[16] both eyes, congested, and discharging a scanty purulent secretion.”
16. On July 31, 1911, the diagnosis of plaintiff’s eyes was changed by Major Lyster to read: “Retinitis, solar,[17] acute, bilateral,[18] following exposure to the sun while at Ludlow Bks., Mund. P. I. on June 2, 1911. In line of duty.”
On August 5 Major Lyster noted some improvement in plaintiff’s eye condition both in lessened photophobia and in the appearance of the conjunctivae. He stated that he had avoided use of the ophthalmoscope, as no material advantage could be obtained by its use, and probable harm might result from the light. Plaintiff had a distance vision as of that date of 20/20 in the right eye and 20/20 in the left eye.
17. On August 14, 1911, plaintiff was transferred to the United States Army General Hospital, Presidio of San Francisco, California, for observation and treatment. His medical transfer card contained the original diagnosis made by Captain Gregory (see finding 13) with a notation that it had been changed on July 31 to the diagnosis referred to in *375 finding 16. He was admitted to Letterman General Hospital, Presidio of San Francisco, on September 12, 1911.
18. The nest day, September 13, plaintiff was examined in the Letterman General Hospital Eye Clinic by Lt. E. M. Welles, who reported that plaintiff had 20/20 vision in both eyes, and made the following diagnosis: “Conjunctivae markedly injected. Photophobia very marked, Ophthalmoscopic examination impracticable.” Lieutenant Welles noted, under “Remarks,” that “Retinitis must have been very slight.” On September 25 plaintiff was again examined, with the following report: “Conjunctivae only moderately congested. When eyes exposed in a moderately dark room, there is no photo-phobia except slight amount when effort made to push up upper lids. Does not use eyes in any way.”
Plaintiff was again examined on October 5,1911. On October 24, a notation was placed on plaintiff’s hospital record that plaintiff objected to having his eyes examined ophthal-moscopically for fear that the light would injure them. In the opinion of the person who made the note, plaintiff showed no symptoms or observable signs that would justify a diagnosis of retinitis.
19. On October 28, 1911, plaintiff requested that he be granted three months’ sick leave “on account of disability incurred in line of duty.” He was granted this leave, and on November 14 was released from the hospital. A notation was placed on his medical record that his “Condition [was] improved but not cured.” Plaintiff then proceeded to Washington, D. C., where he consulted Dr. Oscar Wilkinson, a civilian eye specialist. After an examination of plaintiff’s eyes Dr. Wilkinson diagnosed his condition as “Solar retinitis (neuro)[19] with catarrhal conj. [unctivae][20] due to exposure in tropical sun.”
On January 29, 1912, plaintiff requested and was subsequently granted a month’s leave of regular absence, to take effect at the expiration of his three months’ sick leave. Dr. Wilkinson treated plaintiff during the four months’ leave, *376 and in March 1912 again examined plaintiff’s eyes, with a diagnosis of “Neuroretinitis solar, Subacute[21] with cat. [arrhal] conj. [unctivae].” Pie advised plaintiff not to perform duty in the tropics and stated that plaintiff would recover in a couple of years under proper treatment and surroundings.
20. On March 13, 1912, plaintiff reported back to Letterman General Hospital. His condition was recorded on his hospital medical card as of March 14,1912, as follows:
1. Retinitis, solar, chronic, bilateral, convalescent form.
2. Conjunctivitis, chronic, catarrhal, bilateral. Existed prior to commission (officer’s statement).
March 14, 1912: Retinitis cured.
In line of duty ? 1. Yes. 2. No.
21. By special orders dated March 13, 1912, plaintiff was ordered to report for examination for promotion to captain. On March 14, Capt. R. F. Metcalfe made an opthalmoscopic examination of plaintiff’s eyes without mydriatics, and reported negative findings. On March 21, 23, and 25 plaintiff was orally examined by the Promotion Examining Board on several subjects, and on or before March 26 he was informed by the Recorder of the Board that owing to a deficiency in his general average on the oral examinations he would be required to take written examinations on all the subjects of the examination. Plaintiff stated on March 26, in a letter to the President of the Examining Board, that he was at present recovering from neuroretinitis of both eyes, and that the weakened condition of his eyes made the written examinations a severe physical strain which he was in no condition to undergo. However, on March 26-29 plaintiff took written examinations on the subjects.
22. On March 30, 1912, plaintiff’s eyes were again examined by Captain Metcalfe, who found them normal with the exception of bilateral catarrhal conjunctivae. Plaintiff also complained of photophobia.
Plaintiff was notified on April 12,1912, that he had passed his written examinations, and on June 25,1912, he was pro *377 moted to captain. On July 27 be executed Ms oatb of office and accepted Ms commission as captain, Medical Corps.
By special orders dated April 15, 1912, plaintiff was ordered to return to active duty at Fort Leavenworth, Kansas. He remained there until the latter part of February 1913, with the exception of a short period when he was stationed at Jefferson Barracks, Missouri. During the time when he was at Fort Leavenworth plaintiff consulted two civilian eye specialists, Dr. F. J. Haas and Dr. A. M. Mc-Alester. Dr. Haas made an examination of plaintiff’s eyes, but there is no record available of this examination. On June 13, 1912, Dr. McAlester examined plaintiff with an opthalmoscope, and found that while the retina had a “wooly look” it was otherwise normal. He stated that “From history, I took it to be a case of hyperaesthesis of the retina.” [22] On August 30,1912, Dr. McAlester again examined plaintiff’s eyes, finding them normal as to the retina. He considered that the eye condition was improving very satisfactorily, and prescribed an eyeshading apparatus for plaintiff. He also recommended exercise, good food, use of “protection” glasses when exposed to direct sunlight, and the use of indirect illumination at night.
23. Plaintiff was given an annual physical examination at Fort Leavenworth on November 2, 1912. It was found in part that his nervous system was normal and, with respect to his eyes, that plaintiff had slight bilateral photophobia due to slight scar tissue, and conjunctivae of both lower lids.
24. On February 28,1913, plaintiff arrived at Texas City, Texas, for duty under orders. On March 17 he wrote to the Adjutant General, 2nd Division, that his eyes had become more and more irritated from prolonged exposure to sunlight incident to his present field service. He also said that “While I am able to perform post duty with safety in a more northern latitude, I believe a further attempt to perform field service at this time will result in complete incapacity for duty in a very short time.”
25. On March 21, 1913, plaintiff’s eyes were examined by Maj. Ernest L. Ruffner, Medical Corps, who found that *378 plaintiff bad no acute inflammatory conditions of nerve or retina. On March 25 plaintiff was informed that the result of this examination did not furnish a basis for recommending his return to duty at Fort Leavenworth.
On March 29, plaintiff, by fourth endorsement, wrote that the report as made was not entirely in accordance with the facts, and that the examination, in his opinion, was in some respects superficial and incomplete in scope. The same day plaintiff was admitted to the 2nd Battalion Engineers’ Infirmary at Texas City, and by orders also issued the same day plaintiff was ordered to the base hospital, Houston, Texas. He was granted five days’ delay en route at his request.
26. On April 8, 1913, plaintiff again visited Dr. Haas in Kansas City, who examined his eyes opthalmoscopically. Dr. Haas determined, after some difficulty of diagnosis, that plaintiff’s condition was neuroretinitis; he was doubtful that plaintiff would ever completely recover, and advised him to refrain from being in bright light as much as possible. He also was of the opinion that plaintiff could not do duty in the tropics or subtropics.
27. On April 6,1913, plaintiff reported to the base hospital, Fort Sam Houston, Texas, and by letter dated May 5, 1913, plaintiff requested two months’ sick leave, “in order that I may recuperate and place myself under the observation of competent eye specialists who are thoroughly conversant with my case and present indications.” This request was denied and, by special orders dated May 15, plaintiff was ordered to the Army and Navy General Hospital, Hot Springs, Arkansas, for observation and treatment. He was admitted to this hospital on May 25, 1913. The cause of admission was stated to be: “Retinitis, subacute, both eyes; cause unknown.”
28. Plaintiff was examined at the Army and Navy General Hospital on May 26, 27, and 28, by Capt. James D. Fife, Medical Corps. Captain Fife found that the retina and macula were apparently normal throughout, and that the “Patient’s general condition is neurasthenic, which is evidently the cause of his ocular discomfort. He is self-solici *379 tous, introspective, attaching the utmost importance to the various findings of the many specialists he has gone to.”
On May 30, while a patient at the Army and Navy Hospital, plaintiff requested two months’ sick leave. The application was accompanied by the medical certificate of Captain Fife, who stated in part that plaintiff was “suffering from neurasthenia complicated by neuroretinitis (solar) both eyes * * On June 2, 1913, the diagnosis of his eye condition was changed from that in finding 27 to “neurasthenia. In line of duty. Complications: neuroretinitis, chronic, bilateral (solar), following exposure to extense [sic] light in tropics in 1910-1911. In line of duty.”
29. Plaintiff was granted two months’ sick leave by special orders dated June 6,1913, and on June 10 he was discharged from the Army and Navy General Hospital. He proceeded to Washington, D. C., and on July 6 was again examined by Dr. Wilkinson. Dr. Wilkinson diagnosed his condition as “neuroretinitis, subacute.”
On July 17, plaintiff requested that at the expiration of his sick leave he be relieved from further observation and treatment at the Army and Navy General Hospital, and that he be returned to post duty, “which I am capable of performing.” He indicated, however, that he was unable to perform duty in southern latitudes.
In reply to this request plaintiff was ordered on July 26, 1913, to report to Walter Reed General Hospital, Washington, D. C., with a view to determining his present fitness for post duty under the conditions stated in plaintiff’s letter of July 17, mentioned in the preceding paragraph.
30. Plaintiff reported to Walter Reed General Hospital on August 2, 1913. On August 10, 1913, Maj. P. S. Halloran, Medical Corps, found that plaintiff was physically able to perform post duty, that he had a mild neuroretinitis in both eyes, and that the neurasthenic symptoms in the case had improved. Major Halloran believed that plaintiff should be stationed at a northern station where he would not be subjected to excessive glare or bright sunlight.
31. On August 20 plaintiff proceeded to duty at Fort Logan, Colorado, following his discharge from Walter Reed Hospital. On September 25, 1913, plaintiff was given his *380 annual physical examination at Fort Logan, and the examination records state that plaintiff’s nervous system was normal, his vision was 20/20 in each eye, he was not incapacitated for active field service, and he had no disabilities. An annual physical examination at Fort Logan on October 5, 1914, produced essentially similar results.
32. By special orders dated April 3, 1915, plaintiff was ordered to' Texas City, Texas, for temporary duty. On April 9 plaintiff’s eyes were examined with an ophthalmoscope by Dr. Melville Black, a civilian eye specialist, of Denver, Colorado. Dr. Black furnished plaintiff a certificate to the effect that the appearance of plaintiff’s optic nerves and retinae was very satisfactory, that another year in the North would render him safe from recurrences of his retinitis, but that Dr. Black did not believe that this was the case at present.
Dr. Black’s findings and diagnosis were based more upon the history given to him by plaintiff than upon any pathological appearances seen with the ophthalmoscope. The only abnormality he found in his examination was a remnant of redness of the optic discs. He was of the opinion that plaintiff had practically recovered from his last attack of solar retinitis, but believed that plaintiff should not be subjected to a return to the light conditions which had caused the trouble for at least a year. He advised plaintiff to remain in a climate where plaintiff felt that he would continue to improve.
The next day plaintiff wrote to the Adjutant General inviting official attention to “my continued physical incapacity for duty in tropical and subtropical latitudes * * *,” and by special orders dated April 27, 1915, the special orders of April 3 were revoked.
33. By letter dated July 17, 1915, plaintiff was advised by the Surgeon General’s Office of the impending issuance of an order for duty in the Hawaiian Department. On July 22, plaintiff wrote the Surgeon General’s Office that, while he was due for foreign service and ready to take his turn, he requested assignment to duty in China instead of Hawaii. The reason for the request was indicated to be that Hawaii was in the tropics, and China was well north of the tropics and subtropics. Plaintiff felt that he would be able to do a *381 tour of duty in China without any trouble on account of his eye condition. On July 2'6 plaintiff was advised that assignments to the China stations were made by the Commanding General, Philippine Department.
34. On August 2,1915, plaintiff requested leave of absence for two months and ten days, commencing August 15. The Surgeon General’s Office by endorsement dated August 7 recommended that leave be granted plaintiff to terminate at such time as would enable plaintiff to take the October 5 transport for Honolulu, Hawaii. By special orders dated August 9, plaintiff was ordered to take the October 5 transport for Honolulu.
35. On August 17 and 19, 1915, plaintiff’s eyes were examined by Dr. Edward Jackson, a civilian eye specialist, of Denver, Colorado. Dr. Jackson made a diagnosis of retinal asthenopia,[23] a sequel to solar retinitis, and made a prognosis that there would be slow improvement and possible complete recovery if plaintiff avoided the conditions that originally caused the trouble. Dr. Jackson did not find that plaintiff was suffering from any form of retinitis, but was of the opinion that service by plaintiff in Hawaii “would be likely to cause a relapse, with aggravation of symptoms and indefinite continuation of the condition.” He gave plaintiff a certificate stating in part: “I believe he will be more likely to keep in good condition for eye work if his eyes are not subjected much to very bright light; either tropical sun or glare from water and sand.”
Plaintiff wrote to the Adjutant General on August 28, 1915, reporting his “physical (ocular) incapacity for duty in tropical and subtropical latitudes.” Enclosed with the letter were a certificate of Dr. Black (finding 32), a certificate of Dr. Jackson (preceding paragraph), and a certificate of Dr. William L. Hess, Denver, Colorado, to the effect that plaintiff’s sensitive retinae would never be able to stand the sunlight of other climates than the North Temperate Zone.
By special orders dated September 3, 1915, plaintiff was ordered to Walter Heed General Hospital “for observation as to fitness for tropical service.” He proceeded from Fort *382 Logan, Colorado, to Washington, D. C., by automobile, driving part of the way himself. On September 18 he was admitted to Walter Reed General Hospital.
36. On September 27, 1915, Maj. T. C. Lyster, after examining plaintiff, reported in part to the Commanding Officer, Walter Reed Hospital, that the present condition of plaintiff’s eyes was not such as to unfit him for tropical service.
By special orders dated October 2,1915, plaintiff was ordered to proceed to San Francisco, California, and to take the first available transport to Honolulu for duty in the Hawaiian Department. On October 5 plaintiff requested and was subsequently granted a leave of absence for 20 days, to take effect upon his release from observation and treatment at Walter Reed General Hospital. He was released from Walter Reed Hospital on October 8.
37. On October 11, 1915, Major Noble, Office of the Surgeon General, wrote Col. R. G. Ebert, Chief Surgeon of the Honolulu Medical Department, in part as follows:
Captain John B. H. Waring while serving in the Philippines had some trouble with his eyes. When his order was issued for duty in Hawaii he submitted certificates from civilian ophthalmologists, the purport of which was that service in the tropics would be detrimental to his eyesight. On the strength of this he requested that he not be sent to foreign service.[24]
Major Lyster, who first examined Captain Waring in the Philippines and who was thoroughly familiar with his case, examined Captain Waring who was ordered to the Walter Reed General Hospital for this purpose and submitted report, copy of which he enclosed. Even while in the hospital here in Washington, Captain Waring, I understand, consulted civilian practitioners in regard to his condition, with the idea of further fortifying his protest against foreign service.
For over two years Captain Waring has been on duty at Fort Logan, Colo., a place where the sun is bright in summer and a considerable glare from the snow in winter. It is not thought by this office that the glare of the sun in Hawaii could be greater than that at Fort Logan during the winter, with the sun shining on the snow.
*383 This letter is for your information, and, if you see fit for the information of Major DeLaney, in case Captain Waring should have a relapse of his old eye trouble.
The evidence does not disclose whether or not this letter was ever shown to Major DeLaney.
38. Plaintiff consulted Dr. Wilkinson again in October 1915. Dr. Wilkinson made no particular examination of plaintiff’s eyes at that time, but was of the opinion that plaintiff “still had some trouble,” “still had photophobia, irritated conjunctivae with chronic retinitis (solar),” and advised that plaintiff not be sent to a station in the south or in the tropics because Dr. Wilkinson thought that the hot sun would injure plaintiff’s already weak eyes. He diagnosed plaintiff’s condition as “solar neuroretinitis,” and told plaintiff’s father that plaintiff would recover in a couple of years under proper treatment and surroundings.
39. On October 27,1915, plaintiff requested 25 days’ extension to his leave, and this request was granted. He left Washington, D. C., and proceeded to Fort Leavenworth, Kansas, and thence to Denver, Colorado, by automobile, which he drove part of the time. On November 10 plaintiff left Fort Logan, Colorado, by automobile. He proceeded to San Francisco via the Santa Fe Trail, passing through a part of the Mojave Desert. He arrived in San Francisco on November 25, sailed on December 6, and arrived in Honolulu on December 14. Plaintiff reported for duty at Schofield Barracks and was given several days within which to get settled before going on medical duty at the hospital on December 17.
40. On January 2,1916, plaintiff was admitted to the post hospital at Schofield Barracks, where he was examined by Capt. J. D. Whitham, Medical Corps. Captain Whitham recommended that plaintiff be transferred to the Department hospital for further study, observation, and treatment so as to determine whether or not anything was wrong with plaintiff’s eyes. Plaintiff was admitted to the Department hospital, Honolulu, on January 20, and was placed under the care of Maj. Matthew DeLaney, Medical Corps. The medical transfer card contained the information that plaintiff was “Under observation for neuroretinitis, bilateral, chronic, *384 solar in origin (patient’s statement). In line of duty? Yes.”
41. Major DeLaney listened to tbe complete case bistory as given by plaintiff, and then examined plaintiff’s eyes. Maj or DeLaney found nothing wrong with plaintiff’s eyes except a slight astigmatism in the right eye and a slight haziness in the right optic nerve head, which he believed was due to slight astigmatism, and concluded that plaintiff was not suffering from any form of retinitis.
42. After plaintiff’s admission to the hospital, Capt. L. Mitchell, Medical Corps, was instructed by the commanding officer of the hospital to examine plaintiff as to his mental attitude in general and especially in connection with his eye condition. This was an unusual procedure, but was ordered because Major DeLaney had reported that plaintiff was uncooperative in his medical treatment. Captain Mitchell was also instructed to perform a spinal puncture to determine if plaintiff suffered from syphilis of the nervous system. The result of the spinal puncture examination was negative.
On February 7, 1916, Captain Mitchell made a report to Major DeLaney in part as follows:
* * * examination fails to disclose any organic lesion of the central nervous system. His eye condition, be it imaginary or real, has occupied his thoughts and dictated his actions to an extent that borders on the pathological. His ability to recall various minor incidents, conversations and even the facial expressions of those conversing with him, this over a period of several years, together with the mental irritability and bellicose attitude he assumes towards those who have treated him in the past and who undoubtedly were kindly disposed toward him, makes strongly for a diagnosis of: hypochondriasis.[25] It is believed, if not contra-indicated by an eye condition from which at present he may be afflicted, that a prolonged and rigid rest cure associated with psyco-therapy [sic] would be of benefit in this case.
43. On February 7, 1916, Maj. G. M. Van Poole, Medical Corps, examined plaintiff and found no abnormalities. In Major Van Poole’s opinion, plaintiff was not suffering from *385 any form of neuritis of the optic nerve. On February 10, 1916, a notation of “Hypochondriasis.[26] Line of duty? Yes.” was placed upon plaintiff’s medical records.
On February 18, 1916, a three-man medical board was convened in the hospital to pass upon plaintiff’s case. Plaintiff was called before this Board, recited his medical case history, and stated that the principal symptoms he was then suffering were:
Photophobia, pain in both eyes and a stinging and burning sensation on exposure to light followed by vertigo and nystagmus[27] after the exposure is prolonged.
Plaintiff was examined by the Board, which found no external evidence of any abnormal condition, no apparent nystagmus nor photophobia. Major DeLaney, Major Yan Poole, and Captain Mitchell testified before the Board, at which time plaintiff was not present. The procedure of not having the patient present during the testimony of the medical officers in charge of the case was an unusual one.
The Board at the conclusion of the hearing found that “The supposed disability does not result from organic disease of the eye, and finds that Captain Waring is capable of performing the usual duties of a medical officer of the Army at this post. The Board recommends that Captain Waring be returned to duty.”
44. Plaintiff was discharged from the hospital on February 23,1916, and ordered to return to duty at Schofield Barracks. Plaintiff’s condition was recorded by Major DeLaney on plaintiff’s hospital record as follows:
(1) Under observation for diseases of the eyes. No diseases found.
(2) Hypochondriasis. In line of duty — Yes.
The official notification to company commander of discharge of patient from the hospital, signed by the Commanding Officer of the hospital, stated in part that the “Disease was incurred in line of duty.”
45. On February 24, 1916, plaintiff was directed by telephone to report for duty at Schofield Barracks Hospital. . At *386 about 10:40 a. m. plaintiff reported in person that lie was unable to do duty, and he handed the Commanding Officer a letter containing the information that “I am physically incapacitated for duty by reason of a similar eye injury which compelled me to report sick on January 2, 1916. So far as subjective symptoms go, this eye condition is not improved.” Plaintiff was informed that pending the arrival of the final notification of his discharge from the Department hospital he might return to his quarters. On February 25 plaintiff was ordered to report the following morning (February 26) for duty. He did not report in person, but on the morning of the 26th sent a letter to the Commanding Officer to the effect that he was prevented from compliance with the order to report for duty “by reason of sickness (ocular inflammation) and again report my physical incapacity for performance of official duty.”
46. On February 26, 1916, Lt. Col. William P. Kendall was ordered to examine plaintiff. This was done on February 27. Plaintiff told Colonel Kendall his case history, and also that he (plaintiff) was then suffering from retrobul-bar neuritis.[28] Plaintiff objected to an ophthalmoscopic examination and to the use of mydriatic cocaine, and protested in writing against their use. His written protest stated that the medical history of the case was absolutely clear, and that if the diagnosis could not be confirmed by Army medical officers after the numerous examinations made by them it could only be regarded as an indication of professional incompetence and inexperience on their part. Colonel Kendall did not examine plaintiff’s eyes with an ophthalmoscope, but was of the opinion that plaintiff did not have at that time retrobulbar neuritis, blepharospasm,[29] or photophobia. He found that plaintiff did not show any signs of hypochon-driasis or neurasthenia, and made a diagnosis that plaintiff was “malingering.”
47. On February 29,1916, plaintiff was sent a written order to report for duty as medical officer of the day on the night *387 of March 1 and 2, from 7:00 p. m. to 6:00 a. m. the next day. On the morning of March 1, plaintiff telephoned the hospital executive officer, reported that he was sick, and asked to be placed on sick report. Plaintiff was not placed on sick report as the executive officer thought, based upon reports he had received, that plaintiff was fit for duty.
48. On March 22,1916, plaintiff consulted two civilian eye specialists in Honolulu, Hawaii, Drs. Sogers and Morgan. Both of these specialists found that plaintiff was not suffering from conjunctivitis nor from any form of retinitis at that time. One of the specialists gave plaintiff a certificate that plaintiff was suffering from controllable photophobia, a form of nervous photophobia. Plaintiff had no visible symptoms of real photophobia, however.
49. By special orders dated March 6,1916, a general court-martial was appointed to meet at Schofield Barracks on March 9, 1916, or as soon thereafter as practicable, for the trial of such persons as might properly be brought before it. On April 10 plaintiff was brought to trial before a duly constituted court-martial convened at Schofield Barracks. There were two charges and seven specifications. The first charge, of conduct unbecoming an officer and gentleman, in violation of the 61st Article of War, was supported by four specifications charging plaintiff with falsely representing his ocular condition from January 2,1916, to March 3,1916, and with writing letters containing statements which were insubordinate and reflected discredit upon the professional conduct of his superior officers. The second charge, of conduct to the prejudice of good order and discipline, in violation of the 62d Article of War, was supported by three specifications charging plaintiff with having failed to cooperate with proper medical officers in the treatment of his case between January 2,1916, and March 1,1916, with failing and neglecting to obey orders issued to him to report for duty on the morning of February 26, 1916, and with failing and neglecting to perform duty as officer of the day on March 1 and 2,1916.
On June 7, 1916, plaintiff was convicted on both charges and all specifications except that of having failed to cooperate with proper medical officers in the treatment of his case, *388 and was sentenced to be dismissed from the service of the United States.
50. The sentence of the court-martial was approved by the Commanding General, Hawaiian Department, on June 27, 1916, and the record of the trial was forwarded to the President of the United States through the Judge Advocate General. On August 1, 1916, the Judge Advocate General reviewed the record, and determined that the four specifications laid under the 61st Article of War were insufficient to support the charge, and that the findings of guilty on these specifications were without legal effect. With respect to the first specification under Charge I, the Judge Advocate General said, in part:
A conclusion that the accused did riot have the disease he claimed to have is justified by the evidence. But it does not follow that the evidence is sufficient to support a finding that he did not think that he had that disease. * * * The accused has reasonable grounds for believing himself afflicted by the disease of which he complained. He had been told by eye specialists that he had the disease and that the tropical light of Hawaii would be injurious to' his eyes. * * * The evidence is not sufficient to sustain a finding of wilful falsehood. * * *
With respect to specifications 2 and 3 of Charge II, upon which plaintiff had been found guilty, the Judge Advocate General advised that the findings were correct and legally sufficient to sustain a sentence of dismissal, but that the sentence was more severe than the offense merited. He therefore recommended that the findings on specifications 1, 2, 3, and 4 of Charge I, and Charge I, be disapproved, and that the findings on specifications 2 and 3 of Charge II, the finding on Charge II, and the sentence, be approved; but because of the severity of the sentence he recommended that it be commuted to the loss of 25 files in lineal rank.
51. On August 17, 1916, Secretary of War Newton D. Baker transmitted the record of the trial to the President by letter, which stated in part as follows:
The facts in the case, while the record is exceedingly voluminous, are very simple. This officer, himself a physician, contracted optic neuritis from exposure to *389 sun glare in the tropics. Being a physician, and knowing too much for his own good, he immediately began to acquire and nurse subjective symptoms which had no objective reality, with the result that long after his optic neuritis was cured he still imagined himself to have it. As a consequence, he became surly, insubordinate, and rather contemptuous of his superior medical officers who disagreed with him in the diagnosis of his case.
The net result of this is that we simply had an unruly patient who disagreed with his doctors. His doctors in this case being- military men and he being a part of the military establishment, he ought to' have yielded at least obedience and respect to their orders. In some sense he failed in this. He therefore ought to be punished, but in my judgment he ought not to be dismissed from the Army * * *.
I am so entirely familiar with states of mind like that in which Captain Waring now is, that I do not know whether I can help him or not; but if the recommendation herein set forth is approved by you, I shall write him an official letter in addition, pointing out to him that a continuance of his recent insubordinations will render his separation from the service by dishonorable discharge necessary for the discipline of the Army.
On October 10,1916, the President wrote to the Secretary of War Baker concerning plaintiff.[30] On October 14, 1916, Secretary Baker replied to the President’s letter in part, as follows:
The difficulty with Captain Waring is that, being a physician, he has become hypochondriac about his own condition, thinks he knows more than all the other doctors, and is not only obsessed with unwarranted notions about the condition of his eyes but is truculent and undisciplined in his attitude toward his superior officers. As soon as you have acted on the court-martial papers, I am going to send him a personal letter full of good advice, with just a little feeling that there is only one chance in a thousand of such a letter doing any good. He is an excellent man and his misfortune is greatly to be regretted. * * *
The President concurred in the recommendation of the Judge Advocate General and the Secretary of War, and on October 17, 1916, the President issued and signed the following order:
*390 In tbe foregoing case Capt. John B. H. Waring, Medical Corps, the findings upon the first charge and specifications thereunder are disapproved, the sentence is confirmed, but commuted to the loss of twenty-five files on the lineal list of captains of the Medical Corps.
On October 27,1916, plaintiff was released from arrest and restored to duty.
52. Secretary of War Baker wrote plaintiff on October 31, 1916, in part as follows:
* * * It is entirely clear from this record that you at one time suffered from solar retinitis. It is equally clear that you are now cured. Your experience as a physician will doubtless contain many cases of patients who had a persistent mental impression of a previous but past illness, and that is disclosed by this record to be your situation. Whether or not, however, you continue to be afflicted with any real trouble of the optic nerve or of the retina, you do continue to be, by virtue of the President’s action a member of the Army, the discipline of which requires obedience to the lawful orders of your superiors and respect for them in their professional capacity. This record shows that you have failed in all respects to observe these requirements in your past relations with your senior officers of the Medical Corps. Unless you can conform to these indispensable requirements in the future, your separation from the service will of course be required for disciplinary reasons. This letter is written in the hope that your future career in the Army will be characterized by that respect for the discipline of the service upon which alone a useful career can be based.
53. On November 1,1916, War Department General Order No. 59 was issued. This order published the charges, specifications, findings, and sentence, and concluded as follows:
The sentence having been approved by the convening authority and the record of trial forwarded for the action of the President under the 106th Article of War, the following are his orders thereon:
In the foregoing case of Captain John B. H. Waring, Medical Corps, the findings upon the first charge and specifications thereunder are disapproved. The sentence is confirmed but is commuted to the loss of twenty-five files on the lineal list of captains of the Medical Corps.
54. On November 3,1916, plaintiff requested, in a letter to the Commanding General, Hawaiian Department, that he be *391 granted a three months’ leave of absence beginning on or about November 16, with permission to return to the United States. He stated that he was physically unable to perform his official duties in the present condition of his eyes, and desired to place himself, at his own expense, under the professional observation and treatment of the best oculists in the United States.
Approval of this request was recommended by the Surgeon’s Office, Schofield Barracks, but the Commanding General, Schofield Barracks, and the Commanding General, Hawaiian Department, recommended that the request be disapproved and that plaintiff be ordered before a retiring board in the United States. By special orders dated December 22,1916, an Army Retiring Board was appointed to meet at Chicago, Illinois, for the examination of plaintiff only. The Board was duly constituted and convened on January 10, 1917, at Chicago, Illinois.
55. Upon the opening of the Board plaintiff outlined what he considered to be the facts relative to his disability, indicated that he believed that he had a physical infirmity disqualifying him from service, and stated that should the Board find this to be a fact, he would not oppose retirement, although he did not wish to appear in the light of seeking retirement.
Two witnesses testified for the Army at the hearing before the Board. They were Map Peter C. Field, Medical Corps, and Maj. T. C. Lyster, Medical Corps. On the afternoon of January 10, Major Field and Major Lyster each took the witness stand and submitted written reports of physical examinations of plaintiff which each of them had made on January 9 and January 10, 1917. Further testimony was then suspended to allow plaintiff’s counsel an opportunity to examine and go over the reports with plaintiff.
56. On January 11 Major Lyster resumed the witness stand and testified that his ocular findings indicated no organic diseases of plaintiff’s eyes, but that his findings indicated an abnormal condition; i. <?., a relationship between plaintiff’s nervous system and his ability to use his eyes for the performance of duty in tropical or subtropical regions. Major Lyster attributed the relationship to a number of specified *392 subjective symptoms, and testified that the subjective symptoms indicated nervous asthenopia. He went on to define this term in a general way as eyestrain; i. e., asthenopic eyes are eyes which, when subjected to use, are liable, depending upon the amount of use, to break down to the extent of causing pain, a sense of weariness, general fatigue, and may go further into various forms of asthenopia, such as nervous asthenopia, which includes hysteria, neurasthenia, and other nervous phenomena.
57. Major Lyster testified further that plaintiff’s history together with certain physical signs indicated that plaintiff desired to do duty only under conditions and at places agreeable to him. He stated that, as gathered from plaintiff’s history, plaintiff had always had a nervous temperament which gave evidence of instability when plaintiff was stationed at Parang in 1911. In Major Lyster’s opinion, the idea that plaintiff could not perform duty in the tropics became fixed in plaintiff’s mind when Captain Gregory told him in 1911 that he had had an attack of solar retinitis. He believed that plaintiff’s present physical disabilities were traceable to Captain Gregory’s diagnosis, whether that diagnosis was correct or not. Major Lyster testified that plaintiff’s physical condition did not originate wholly in the line of duty but that it did in part, in that the diagnosis in 1911 caused the idea to become fixed in plaintiff’s mind that he could not perform duty in the tropics. In Major Lyster’s opinion, plaintiff’s condition was amenable to treatment, although he did not know how long it would take, and he stated that, not being a neurologist, he did not feel competent to say whether or not the underlying nervous causes could be cured. Major Lyster was of the opinion that plaintiff was physically qualified to perform duty provided he was conscientiously willing to do so, and provided that plaintiff possessed sufficient willpower to maintain self-control, but that if plaintiff were unwilling to perform duty in a certain post his physical disability did disqualify him for duty.
58. Major Field then returned to the witness stand and resumed his testimony. His ocular findings did not indicate any organic disease of plaintiff’s eyes, and his diagnosis of plaintiff’s condition at the time of the examination (Jan *393 uary 9 and 10) was asthenopia, -which he defined as eyestrain. In his opinion the asthenopia was dependent upon instability of plaintiff’s nervous system. Major Field testified that his diagnosis of asthenopia was supported by plaintiff’s history, and that the instability of plaintiff’s nervous system was indicated by a number of physical signs and by plaintiff’s history. Major Field stated that while he did not claim to have expert or special knowledge of nervous diseases, it was his opinion that plaintiff’s unstable nervous system was congenital and therefore existed prior to plaintiff’s commission. He was unable to form an opinion as to whether or not plaintiff’s asthenopic symptoms existed prior to plaintiff’s commission, but stated that be knew of no record or history evidencing plaintiff’s instability prior to June, 1911. He testified that if the occurrence of June 2,1911 frightened or caused plaintiff to worry, it might have been sufficient cause to at least temporarily unbalance plaintiff’s nervous system. In Major Field’s opinion, plaintiff’s symptoms of asthenopia were amenable to treatment, but that plaintiff was physically able to perform all of the duties of his rank provided he was conscientiously willing to do so under all conditions and possessed sufficient willpower to maintain self-control. The Board then adjourned without objection, on the afternoon of January 12, as the record had not yet been written up to date.
59. Major Field continued to testify on January 13 and 14. Following the conclusion of his testimony, and the introduction of documentary evidence, the Board adjourned until January 16,1917. It reconvened on that date, at which time plaintiff’s counsel advised the Board that at his request plaintiff had submitted to the examination of a civilian eye specialist in Chioago, but that this examination had not yet been completed. Plaintiff’s counsel also stated that plaintiff was desirous of submitting to the examination of eye specialists and a neurologist in the East, in view of the suggestion made for the first time in his medical history of nervous instability existing since childhood. An adjournment until January 25 was requested to enable plaintiff to consult with specialists and adduce their depositions before the Board. The request for adjournment was denied.
*394 Plaintiff then testified on his own behalf, following which the Board was closed, on January 16,1917, for deliberation. The Board thereafter found:
Captain John B. H. Waring is incapacitated for active service by reason of a neurosis affecting the functions of the eyes to such an extent as to disable him for the performance of military duty.
The board further finds that the exciting cause of the incapacity was an illness at Parang, P. I., June 2, 1911; that the underlying or fundamental cause is a defective nervous system; that said incapacity is not incident to the service; and that it is not permanent.
60. Following the recommendation of the Surgeon General that plaintiff be ordered to Letterman General Hospital for observation and treatment for a period of six weeks, plaintiff was transferred, by special orders dated February 1,1917, to Letterman General Hospital for observation and treatment.
Plaintiff was examined by Lt. Henry L. Wagner, Medical Corps, on March 13, at which time a diagnosis of nervous asthenopia was made, and on April 10, 1917, he reported a diagnosis of plaintiff’s condition as “Hystero-neurasthenic[31] asthenopia.”[32]
On the same day, April 10, Maj. L. L. Smith, Medical Corps, reported that since plaintiff’s admission to Letterman General Hospital he had been under observation of Lieutenant Wagner, an eye, ear, nose, and throat specialist, and under the observation of Major Smith as to plaintiff’s physical and mental condition. The report continued in part, as follows:
5. It is believed, therefore, that this officer’s eye condition is due to hystero-neurasthenic asthenopia. There is no evidence of any kind to show that he is suffering from a neuroretinitis or other organic disease of the eye or brain. * * * It is believed that the neurasthenic element is the predominating factor, and that the hysterical element is slight, and is superimposed. * * *
* Sf * * *
*395 7. * * * I believe, however, that this officer may be classed as a peculiar or psychopathic personality. He is self-centered, given [sic] the impression of thinking of little except himself and his eye condition ; he lacks initiative at this time. It is believed that the inability to use his eyes is of the nature of an inhibition and that the same influences are at work when any duty is required of him. He has worn tinted glasses for so’ long a period that his eyes have become too much accustomed to dull light afforded through such protection, and therefore he cannot now give them up without a severe struggle and much discomfort. * * *
¡k % # #
9.Progress. — Patient has shown absolutely no improvement in his symptoms while under observation here. His mental attitude toward his eye condition interferes with any progress towards recovery.
10. Prognosis. — Unfavorable as to complete recovery from the basic disease. The eye symptoms might improve at some future time, later giving place to other nervous symptoms of more or less disabling character. It is believed that he is permanently incapacitated from performing the duties of his grade. * * *
11. This officer is suffering from asthenopia, hystero-neurasthenic form, due to an inherent unstable nervous organization which existed prior to commission and is, therefore, not in line of duty. This disability is believed to be permanent, and his retirement is, therefore, recommended.
61. On April 21,1917, Col. G. B. Duncan, General Staff, War Department, submitted a memorandum to the Chief of Staff forwarding the proceedings of the Army Betiring Board in plaintiff’s case, reciting the findings of the Betiring Board and quoting paragraphs 9,10, and 11 of the Letterman General Hospital report ref erred to in the preceding findings. It was recommended that the findings of the Board be approved,[33] and that plaintiff be wholly retired.
On May 2, 1917, the Chief of Staff recommended to the Secretary of War that the findings of the Board be approved *396 and that Captain Waring be wholly retired. Three days later, on May 5, 1917, Secretary of War Newton D. Baker issued the following order:
The proceedings and findings of the retiring board are approved by the President, and, by his direction, CaptaiN John B. H. Waking, Medical Corps, is wholly retired from the service under the provisions of Sections 1252 and 1275, Bevised Statutes, and his name will, hereafter, be omitted from the Army Register.
Special Orders No. 104 were published on May 5, 1917, in part as follows:
74. Capt. John B. H. Waiiing, Medical Corps, having been found by an Army retiring board incapacitated for active service on account of disability which is not the result of any incident of the service, and such finding having been approved by the President, is, by his direction, wholly retired from the service under the provisions of sections 1252 and 1275, Revised Statutes, and his name will hereafter be omitted from the Army Register.
Also, on May 5, plaintiff was notified by telegram that he was wholly retired from the military service. He thereafter received one year’s severance pay as provided by law.
62. Defendant has been unable to locate any record which showed that President Wilson ever personally approved the findings of the Retiring Board, or personally ordered plaintiff to be wholly retired, or that he delegated authority to approve plaintiff’s retirement to any person. A letter from the then Secretary of War, George H. Dern, to Senator Sheppard, the Chairman of the Senate Committee on Military Affairs, dated April 13, 1936, contains the following:
After a further review of the entire case in the War Department, the proceedings and findings of the retiring board were approved by the Secretary of War (Mr. Baker) who took final action in the name of the President, and on May 5, 1917, the War Department issued the following order: * * * In this connection the War Department holds that the approval and issuance of the wholly retirement order by the Secretary of War, for the President was valid exercise of duty delegated authority of the Executive; * * *.
A certificate by Maj. Gen. W. M. Bergin, the Adjutant General, dated April 8,1953, states in part as follows:
*397 I hereby certify that it lias been the established policy and consistent practice of the Department of the Army since 1861 for the Secretary to act on the proceedings of Army retiring boards under the provisions of Sections 1250 and 1251, Eevised Statutes, rather than transmit them to the President for approval or disapproval action and signature. * * * Sometime subsequent to 1890 a form of approval was adopted for the signature of the Secretary which read substantially as follows: “The proceedings and findings of the retiring board are approved by the President; and, by his direction * * * is retired from active service this date in conformity with Section 1251, Eevised Statutes, * * * Secretary of War.” At the time of the retirement of John B. H. Waring in 1917, it was the established policy and consistent practice in effect since 1861 for the Secretary to act on the proceedings of Army retiring boards under the provisions of Section 1252, Eevised Statutes, rather than transmit them to the President for approval or disapproval action and signature. * * *
63. On May 22, 1917, plaintiff wrote a letter to the President entitled “Application for Ee-hearing before Army Ee-tiring Board on the case of Captain John B. H. Waring, Medical Corps, Ordered Wholly Eetired, May 5,1917.” He requested that the order wholly retiring him from the Army be revoked, that he be accorded a full and fair re-hearing before an Army retiring board, or that he be placed on the retired list of the Army with due rank and pay. He further asked that pending a full inquiry into his case no successor be nominated to fill his vacancy. No record has been found indicating that any action was taken on this application.
64. No specific record has been located in the War Department files showing who was appointed to the office vacated by plaintiff’s retirement, but it appears that the office was filled by Charles L. Gandy.
65. On February 26, 1918, a bill was introduced in the Senate authorizing the President to nominate and appoint plaintiff a major on the retired list, and increasing the retired list by one for the purposes set out in the bill. The bill was referred to the Senate Committee on Military Affairs, and no further action was taken on it.
66. In a memorandum to the Secretary of War, dated August 7, 1918, the Acting Judge Advocate General, S. T. *398 Ansell, reviewed the court-martial proceedings and the proceedings of the Retiring Board, and concluded as follows:
7. For the reasons set forth above, this office replies as follows to the questions submitted by the Secretary: (1) No legal right of Dr. Waring has been denied him; but (2) a somewhat too unyielding exercise of its discretionary power by the retiring board resulted in Dr. Waring being deprived of the right to adduce evidence in his own behalf which might possibly have resulted in a different finding by the board, or which might have induced the President to withhold the approval of the board’s finding.
On August 16, 1918, Secretary of War Baker wrote to Andres J. Montague, a member of the House of Representatives, enclosing a copy of the Acting Judge Advocate General’s memorandum. The Secretary of War indicated that he did not share the view that a more generous use of the discretion of the Board would have been wise, in view of the long history of the case and the very obvious condition of Dr. Waring, which could not have been a surprise to his counsel. The Secretary concluded that “the difference of opinion between Judge Ansell and me on that point is of no moment, since the President’s action in the case is final, and is not open to review even by the President himself.”
67. On May 28, 1919, a bill was introduced in the Senate for the relief of plaintiff. The bill passed the Senate on February 2,1920, but did not pass the House. On April 13, 1921, Senate Bill 667 and H. R. 1757 were introduced in Congress, for the relief of plaintiff. The bill passed both the Senate and the House, and when approved on May 6,1922, by President Harding, became Public Law 210, 67th Congress. The provisions of Public Law 210 are quoted in finding 3.
68. On December 11, 1922, President Harding wrote to Secretary of War John W. Weeks as follows:
I have had urged upon me very strongly the restoration of John B. Waring to his rank of captain in the Medical Reserve Corps and then his enrollment on the retired list of the officers of the Army, as provided in the bill, a copy of which I am enclosing, to you. From such cross-questioning as I have been able to do it does not appear to me that Waring deserves the consideration which the bill authorizes. I am wondering if there is *399 not some manner in which, this man may be visited with a view to inquiring the state of his health since he is out of the service. You will know whether you have such facilities.
Secretary Weeks wrote the President on December 23, 1922, strongly recommending that no steps be taken toward the reappointment of plaintiff with a view to his retirement, and indicating the opinion that the case did not deserve the consideration the special legislation authorized.
On February 2, 1923, the following letter was sent to President Harding by members of the subcommittee considering bills for the relief of plaintiff:
We of the subcommittees of Congress to which were referred the bills for the relief of Captain J. B. H. Waring — some of us were at first opposed to the action — submit that our investigation through three committees of each House, established beyond a doubt the injustice done the ofiicer. His dismissal being without authority of law was null and void and no legislation should have been necessary.
A former administration of the War Department reported against the bill and went so far as to refuse the request of the committee for the papers in the case. Notwithstanding this opposition the bill passed the Senate twice and would as often have passed the House but for lack of time.
We are convinced that the War Department should not be allowed to arbitrate in the matter and if our investigation is not sufficient to induce your action then we respectfully submit that some disinterested law officer of the Government be directed to study the case and make report to you, thus enabling you to carry out the law and undo the injustice to which everyday’s delay only adds.
President Harding and all subsequent Presidents have refused to take any affirmative action in executing Public Law 210, 67th Congress.
69. Plaintiff has written many letters to each President, Secretary of War, Adjutant General, and other persons in high Government positions subsequent to his retirement. These letters were lengthy and frequently accused the Army of illegally railroading him from the military service as the result of a conspiracy.
*400 70. On May 9, 1924, the Secretary of War directed that the Inspector General of the Army cause a special investigation to be made of plaintiff’s case. The Inspector General advised plaintiff in writing of the investigation, and requested information as to when plaintiff could testify before him, and the names and addresses of witnesses plaintiff might desire to have examined. Plaintiff, upon the advice of counsel, informed the Inspector General that he could not take any part in the investigation.
71. On July 15, 1924, plaintiff wrote to the Acting Secretary of War that one of plaintiff’s friends had been approached by a member of the Army General Staff, who offered to influence “the Harding special investigation of my case” for a sufficient monetary compensation to be paid in advance. Again, on September SO, 1924, plaintiff wrote a letter to the Secretary of War containing similar allegations. By letter dated October 15, 1924, plaintiff was requested to submit a full and complete statement of facts in substantiation of his charges, and on October 25 plaintiff was again requested to supply the information. The evidence fails to indicate any further correspondence on this matter.
72. In June of 1931 the then Chief of Staff of the Army, Gen. Douglas MacArthur, directed the Inspector General to investigate plaintiff’s case, and to report his opinions and recommendations. Maj. Gen. Hugh A. Drum, the Inspector General, submitted his report on September 15, 1931, concluding that the order wholly retiring plaintiff was legal and fully justified by the facts, and that Public Law 210 was not mandatory.
73. In 1933 and 1935 bills for the relief of plaintiff were introduced in the House of Representatives and referred to the Committee on Military Affairs, but no further action was taken on the bills.
On January 30,1936, H. R. 10785, 74th Congress, 2d Session, was introduced for the relief of plaintiff. The bill passed both the House and the Senate, but on June 16,1936, President Franklin D. Roosevelt vetoed the bill. No further action was taken on this bill.
On January 31, 1939, a bill for the relief of plaintiff was introduced in the House and referred to the Committee on *401 Military Affairs. No further action was taken on this bill.
74. On October 9,1944, plaintiff was advised by letter that he was entitled to a review of his case under the provisions of Section 302 of the Servicemen’s Readjustment Act of 1944, and that, if he would submit a formal application for review, the case would be carefully reviewed. On November 1,1944, plaintiff signed an application for review and transmitted it to' the War Department.
Plaintiff was notified by the Secretary of War’s Disability Review Board that his case would be reviewed on December 12, 1944, and plaintiff was advised that he could appear before the Board in person or by counsel, offer witnesses, and submit any written evidence he desired to be considered by the Board. By letter dated December 8, 1944, plaintiff advised the Board that he would be unable to appear in person and that he did not feel it “practicable” to' be represented by counsel.
75. The Disability Review Board met in Washington, D. C., on December 12, 1944, and reviewed plaintiff’s case. On J anuary 11, 1945, the Board affirmed all of the findings of the Army Retiring Board, and on January 15,1945, plaintiff was notified of the affirmance.
78. On February 17, 1947, a bill for the relief of plaintiff was introduced in the Senate. On March 9,1949, House Bill 3403, 81st Congress, 1st Session, was introduced for the relief of plaintiff and referred to the Committee on the Judiciary. This bill, which is quoted in finding 2, was referred to the Court of Claims by House Resolution 253, 81st Congress, 1st Session, quoted in finding 1.
77. Subsequent to the order wholly retiring plaintiff in 1917, he became associated with Dr. L. A. Schipfer, of Bismarck, North Dakota, an eye, ear, nose, and throat specialist. After about one year in this position plaintiff went to Chicago, where he took a postgraduate course at the Chicago Eye and Ear College. He spent the summer of 1918 as assistant to Dr. H. H. Briggs in Asheville, North Carolina, and on his return to Chicago in the fall of that year became associated with Dr. Lee Roy Thompson, an eye, ear, nose, and throat specialist. Thereafter plaintiff became associated with Dr. Seymour Oppenheimer, a New York eye, ear, nose, and throat *402 specialist. In the early part of 1921 plaintiff moved to Ohio and set up his private office at Blanchester, Ohio. From 1928 to the present, plaintiff has resided and maintained an office at Wilmington, Ohio. From 1928 to 1947 plaintiff also maintained offices at Norwood, Ohio, but because of an arthritic condition was forced to give up his Norwood practice.
78. Since 1917 plaintiff has avoided overuse of his eyes and exposure to strong light, sun glare, sand, and snow, and has continued to the present time to use protective optical glasses. Upon overexposure to light of plaintiff’s unprotected head and eyes, he develops blurred vision and increasing vertigo.

 Light is used in the sense of exposure to the sun, not as meaning moderate.

 An ophthalmoscope is an instrument for the purpose of visualizing the interior of the eyeball; namely, the iris, lens, vitreous, and retina.

 “Neuroretinitis” is medically defined as an inflammation involving both the optic nerve and the retina.

 “Solar retinitis” is medically defined as an inflammation of the retina, usually in the macular region of the eye, resulting from undue exposure to intense actinic radiation [sun, snow, etc.].

 Sensitivity to light.

 Tendency to emotional instability.

 Morbid anxiety about one’s health and conjuring up imaginary ailments.

 A rapid involuntary oscillation of the eyeballs.

 This letter has not been located and Is not In evidence.

 “Hystero-neurasthenic” is medically defined as neurasthenia associated with hysteria, and “asthenopia” is medically defined as weakness or speedy tiring of the visual organs attended by pain In the eyes, headaches, or dimness of vision.

 The contradiction between the April 10 report and the finding of the Board as to whether or not the disability was permanent appears to have been given no consideration by Colonel Duncan.

 Plaintiff in open court agreed to the truth of the certificate, but objected to its materiality. We deem It quite material.

 An ophthalmoscope Is an instrument first introduced by Helmholtz in 1851 for the purpose of visualizing the interior of the eyeball; namely, the iris, lens, vitreous, and retina.

 “Neuroretinitis” is medically defined as an inflammation involving both the optic nerve and the retina. The term “acute” is medically defined as recently acquired and actively going on. The retina is the Inner layer of the eyeball concerned with image formation. It is the visual nerve layer of the eyeball, and its function is to receive visual impulses and to transmit these through the optic nerve, optic tracts, etc., to the brain.

 Photophobia” is medically defined as sensitivity to light.

 “Conjunctivae” is medically defined as the outer layer of epithelial cells forming the mucous membrane covering the eyeball and inner surfaces of eyelids except cornea.

 “Retinitis, solar” is medically defined as an inflammation of the retina, usually in the macular region of the eye, resulting from undue exposure to intense actinic radiation (sun, snow, etc). “Macular” is medically defined as pertaining to that area of the retina concerned with distinct central (straight ahead), vision.

 “Bilateral” means both eyes.

 Solar retinitis (neuro)” is medically defined as an inflammation of the retina resulting from undue exposure to intense actinic radiation (sun, snow, etc.). Of. definition of Retinitis, solar, footnote 4.

 This term is medically defined as an inflammation of the outside lining of the eyeball (conjunctivae), not purulent in nature.

 “Subacute” is medically defined as not as severe as acute; i. e., more or less either recovering from an acute phase or going into a chronic phase.

 The term “hyperaesthesia” [sic] of the retina is medically defined as hypersensitivity of the retina (unusual sensitivity to light, glare, etc.).

 “Retinal asthenopia” is defined medically as sensitivity of the retina (weakness)«.

 Of. finding 33.

 Captain Mlteliell defined “hypochondriasis” as “an Indication of constitutional inferiority manifested by group vagus and indefinite symptoms that have no pathological basis.”

 “Hypochondriasis” Is medically defined as nonorganic manifestation of symptoms based on some inferiority complexes.

 “Nystagmus” is medically defined as jerky movements of the eyeball' horizontally, vertically, or a combination of both.

 The term “retrobulbar neuritis” is medically defined as inflammation of the optic nerve (that part of the optic nerve which runs from behind the eyeball to the optic chiasma in brain).

 The term “blepharospasm” is medically defined as that condition in which the patient has difficulty in opening the eyes due to irritation of various hinds (infection, photophobia, etc.).

 This letter has not been located and Is not In evidence.

 “Hystero-neurasthenic” Is medically defined as neurasthenia associated with hysteria.

 “Asthenopia” is medically defined as weakness or speedy tiring of the visual organs attended by pain in the eyes, headaches, or dimness of vision.

 The Board found a nonpermanent disability, while the Letterman General Hospital report, subsequent to the Board’s finding, stated that plaintiff was permanently disabled. The record does not reveal that any consideration was given to these conflicting findings.